RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Defendant Chicago Title
Insurance Company

| | |
|---|---|
| PETER MOCCO, LORRAINE MOCCO AND FIRST CONNECTICUT HOLDING GROUP LLC, IV,<br><br>Plaintiffs,<br><br>vs.<br><br>AEGIS FRUMENTO AND CHICAGO TITLE INSURANCE COMPANY,<br><br>Defendants. | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY<br><br>CIVIL ACTION NO.<br><br>**NOTICE OF REMOVAL** |

TO:    Clerk
        United States District Court, District of New Jersey
        M.L. King, Jr. Federal Bldg. & U.S. Courthouse
        50 Walnut Street
        Newark, New Jersey 07102

WITH NOTICE TO:

        Clerk
        New Jersey Superior Court, Law Division
        Essex County
        Veteran's Courthouse
        50 West Market Street
        Newark, New Jersey 07102

        James Scarpone, Esq.
        Scarpone & Vargo LLC
        50 Park Place, Suite 1300
        Newark, New Jersey 07102
        Attorneys for Plaintiff

Joseph P. LaSala, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kembell Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
Attorneys for Defendant Aegis Frumento, Esq.

PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §1441 and §1446, defendant Chicago Title Insurance Company, ("Chicago Title"), with the consent and joinder of defendant Aegis Frumento, Esq. ("Frumento"), hereby gives notice of removal of this action, which was commenced in the New Jersey Superior Court, Law Division, Essex County, Docket No. ESX-L-641-12 ("New Jersey Superior Court Action"), to the United States District Court for the District of New Jersey, with full reservation of any and all rights, claims, remedies, objections and defenses.

As grounds for this removal, Chicago Title states the following:

1.    Plaintiffs Peter and Lorraine Mocco are citizens of the State of New Jersey residing at 81 Clark Road, Bernardsville, New Jersey.

2.    Plaintiff First Connecticut Holding Group LLC, IV is a defunct New Jersey limited liability company, which Plaintiffs claim has a principal place of business located at 345 Tenth Street, Jersey City, New Jersey and is owned 100% by Lorraine Mocco.  While Chicago Title does not concede said ownership, to the extent any claim may be brought on behalf of First Connecticut Holding Group LLC, IV in this action (a fact also not conceded by Chicago Title), it is based on Lorraine Mocco's asserted 100% ownership of First Connecticut Holding Group LLC, IV.

3.    Chicago Title is a Nebraska Corporation with a principal place of business located at 601 Riverside Avenue, Jacksonville, Florida.  Plaintiff is a title insurance company licensed to do business in the State of New Jersey.

2

4. Defendant Frumento is a citizen of New York.

5. Plaintiffs filed this action in the New Jersey Superior Court, Law Division, Essex County.

6. This is a civil action over which the District Court possesses original jurisdiction under 28 U.S.C. §1332(a), and therefore, Chicago Title is entitled to remove this action to the District Court pursuant to 28 U.S.C. §1441.

7. This action is removed on the basis of diversity jurisdiction. This action is between citizens of different states, i.e., plaintiffs are New Jersey residents, and defendants are: (i) a Nebraska Corporation with a principal place of business in Jacksonville, Florida; and (ii) an individual residing in New York.

8. The matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs. While the Plaintiffs did not plead an amount in controversy in their complaint, in a related action styled Mocco, et al. v. Licata, et al., pending in the Superior Court of New Jersey, Essex County, Chancery Division, Consolidated under Docket No. ESX-C-280-98, originating from the same transactions at issue here, the Plaintiffs submitted a Statement of Damages placing the amount in controversy as to Chicago Title in excess of $100 million. See March 8, 2012 Certification of Michael R. O'Donnell, Esq., at Exhibit A, attaching a March 14, 2011 Letter from James Scarpone, Esq., counsel for Plaintiffs; see also Raspa v. Home Depot, 553 F.Supp 2d. 514, 521-522 (D.N.J. 2007) (finding that where a complaint is silent as to damages, the removing defendant may establish the amount in controversy by a preponderance of the evidence, i.e., that it is more likely than not). In addition,

Plaintiffs seek punitive damages, which would further establish the amount in controversy. See id. at 522.

9.      All Defendants consent to and join in this removal. Each defendant expressly reserves its right to contest personal jurisdiction in its first responsive pleading pursuant to Fed. R. Civ. Pr. 12(b).

10.     On February 8, 2012, Chicago Title acknowledged service of a copy of the Complaint, Summons, and Track Assignment in the New Jersey Superior Court Action, copies of which are attached hereto as Exhibit A. To Chicago Title's knowledge, no further pleadings have been filed in the New Jersey Superior Court Action other than a Civil Case Information Statement.

11.     This Notice of Removal is timely. See 28 U.S.C. §1446(b).

12.     Pursuant to 28 U.S.C. §1446(a), Chicago Title has attached hereto, as Exhibit A, true and complete copies of all process, pleadings and orders served upon it in the New Jersey Superior Court Action and incorporates them herein as part of this Notice of Removal.

13.     A copy of this Notice of Removal is being served on Plaintiffs and filed contemporaneously with the Clerk of the New Jersey Superior Court, Law Division, Essex County.

14.     The Complaint contains a jury demand.

15.     For the foregoing reasons, Chicago Title hereby removes this action to the United States District Court for the District of New Jersey.

WHEREFORE, Chicago Title requests that this civil action proceed in the United States District Court for the District of New Jersey as an action properly removed thereto.

RIKER, DANZIG, SCHERER,
HYLAND & PERRETTI LLP
Attorneys for Defendants
Chicago Title Insurance Company

By: _____
Michael R. O'Donnell

Dated: March 8, 2012

THIS NOTICE OF REMOVAL HAS BEEN FILED WITH THE CONSENT AND JOINDER OF ALL DEFENDANTS AS FOLLOWS:

MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

Attorneys for Defendant Aegis Frumento, Esq.

By: _____
Joseph P. LaSala, Esq.

Dated: March 7, 2012

5

4218827v3

## CERTIFICATE OF FILING AND SERVICE

I certify that on the date indicated herein I caused one copy of this Notice of Removal and a Civil Cover Sheet to be filed by electronic filing with the Clerk, United States District Court, District of New Jersey, M.L. King, Jr. Federal Bldg. & U.S. Courthouse, 50 Walnut Street, Newark, New Jersey 07102, to be sent under separate cover by Federal Express to the Clerk, New Jersey Superior Court, Law Division, Essex County, Veteran's Courthouse, 50 West Market Street, Newark, New Jersey 07102 and to be sent under separate cover by e-mail and Federal Express to Plaintiffs' counsel, James Scarpone, Esq., at Scarpone & Vargo, LLC, 50 Park Place, Suite 1003, Newark, New Jersey 07102.

Dated: March 8, 2012

_____
Jonathan M. Sandler

4218827.3

6

# EXHIBIT A

**SCARPONE & VARGO, LLC**
By:     James A. Scarpone, Esq.
50 Park Place, Suite 1003
Newark, New Jersey 07102
(973) 623-4101
Attorneys for Plaintiffs, Peter Mocco, Lorraine Mocco and First Connecticut Holding Group
LLC, IV

|  |  |
|---|---|
| PETER MOCCO, LORRAINE MOCCO AND FIRST CONNECTICUT HOLDING GROUP LLC, IV, | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: ESSEX COUNTY |
| Plaintiffs, | Docket No. ESX-L-641-12 |
| v. | Civil Action |
| AEGIS FRUMENTO AND CHICAGO TITLE INSURANCE COMPANY, | Before:  Hon. Paul J. Vichness, J.S.C. |
| Defendants. | **CIVIL ACTION SUMMONS** |

From The State of New Jersey
To The Defendant Named Above:     CHICAGO TITLE INSURANCE COMPANY

The plaintiffs, named above, have filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (The address of each deputy clerk of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

_/s/ Jennifer M. Perez_

**JENNIFER M. PEREZ,**
Acting Clerk of the Superior Court

DATED: February 3, 2012

Name of Defendant to Be Served:    Chicago Title Insurance Company

Address of Defendant to Be Served: c/o Michael R. O'Donnell, Esq.
Riker Danzig Scherer Hyland & Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981

**ATLANTIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08401

LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY:**
Deputy Clerk of the Superior Court
Case Processing Section, Room 115
Justice Center, 10 Main St.
Hackensack, NJ 07601-0769

LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
Attn: Judicial Intake
First Fl., Courts Facility
49 Rancocas Rd.
Mt. Holly, NJ 08060

LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(800) 496-4570

**CAMDEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Processing Office
1st Fl., Hall of Justice, Suite 150
101 S. Fifth St.
Camden, NJ 08103

LAWYER REFERRAL
(856) 964-4520
LEGAL SERVICES
(856) 964-2010

**CAPE MAY COUNTY:**
Deputy Clerk of the Superior Court
9 N. Main Street
Cape May Court House, NJ 08210

LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
60 West Broad Street
P.O. Box 10
Bridgeton, NJ 08302

LAWYER REFERRAL
(856) 696-5550
LEGAL SERVICES
(856) 691-0494

**ESSEX COUNTY:**
Deputy Clerk of the Superior Court
Civil Customer Service
Hall of Records, Room 201
465 Dr. Martin Luther King, Jr. Blvd.
Newark, NJ 07102

LAWYER REFERRAL
(973) 622-6204
LEGAL SERVICES
(973) 624-4500

**GLOUCESTER COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Attn: Intake
First Fl., Court House
1 North Broad Street
Woodbury, NJ 08096

LAWYER REFERRAL
(856) 848-4589
LEGAL SERVICES
(856) 848-5360

**HUDSON COUNTY:**
Deputy Clerk of the Superior Court
Superior Court, Civil Records Dept.
Brennan Court House- 1st Floor
583 Newark Ave.
Jersey City, NJ 07306

LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

**HUNTERDON COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08822

LAWYER REFERRAL
(908) 735-2611
LEGAL SERVICES
(908) 782-7979

**MERCER COUNTY:**
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 S. Broad Street, P.O. Box 8068
Trenton, NJ 08650

LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the Superior Court
Middlesex Vicinage
2nd Floor - Tower
56 Paterson Street, P.O. Box 2633
New Brunswick, NJ 08903-2633

LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

**MONMOUTH COUNTY:**
Deputy Clerk of the Superior Court
Court House
P.O. Box 1269
Freehold, NJ 07728-1269

LAWYER REFERRAL
(732) 431-5544
LEGAL SERVICES
(732) 866-0020

**MORRIS COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
Washington & Court Streets
P.O. Box 910
Morristown, NJ 07963-0910

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**OCEAN COUNTY:**
Deputy Clerk of the Superior Court
118 Washington Street, Room 121
P.O. Box 2191
Toms River, NJ 08754-2191

LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

**PASSAIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton St.
Paterson, NJ 07505

LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 523-2900

**SALEM COUNTY:**
Deputy Clerk of the Superior Court
Attn: Civil Case Management Office
92 Market Street
Salem, NJ 08079

LAWYER REFERRAL
(856) 935-5629
LEGAL SERVICES
(856) 451-0003

**SOMERSET COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
40 North Bridge Street
P.O. Box 3000
Somerville, NJ 08876

LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY:**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

**UNION COUNTY:**
Deputy Clerk of the Superior Court
1st Fl., Court House
2 Broad Street
Elizabeth, NJ 07207-6073

LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 475-2010

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION
ESSEX VICINAGE

JAN 2 5 2012

FINANCE DIVISION
RECEIVED/FILED                    #29

**SCARPONE & VARGO LLC**
By:     James A. Scarpone, Esq.
50 Park Place, Suite 1003
Newark, New Jersey 07102
(973) 623-4101
*Attorneys for Plaintiffs, Peter Mocco, Lorraine Mocco and First Connecticut Holding Group LLC, IV*

| | |
|---|---|
| PETER MOCCO, LORRAINE MOCCO AND FIRST CONNECTICUT HOLDING GROUP LLC, IV, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: ESSEX COUNTY |
| Plaintiffs, | Dkt. No.  ESX-L- 641-12 |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| AEGIS FRUMENTO AND  CHICAGO TITLE INSURANCE COMPANY, | |
| Defendants. | |

Plaintiffs, PETER MOCCO, LORRAINE MOCCO and FIRST CONNECTICUT

HOLDING GROUP LLC, IV, through their attorneys, Scarpone & Vargo LLC, as their

Complaint against Defendants, AEGIS FRUMENTO and CHICAGO TITLE INSURANCE

COMPANY, allege:

## THE PARTIES

**The "Mocco Parties."**

    1.    Plaintiff Peter Mocco is a citizen of the State of New Jersey residing at 81 Clark

Road, Bernardsville (Somerset County), New Jersey.

    2.    Plaintiff Lorraine Mocco is a citizen of the State of New Jersey residing at 81

Clark Road, Bernardsville (Somerset County), New Jersey.

3.      First Connecticut Holding Group LLC IV is a limited liability company, having its principal place of business at 345 Tenth Street, Jersey City (Hudson County), New Jersey. Lorraine Mocco is the owner of 100% of the membership interests in FCHG IV.

4.      Defendant Aegis Frumento was at all relevant times a resident of the State of New York and a lawyer practicing under the laws of New York.  Mr. Frumento's former law firm, Singer Frumento LLP, maintained a presence and practice in New Jersey and represented James Licata and First Connecticut Consulting Group, Inc. in the Titan case which was the first of the five consolidated cases under Docket No. ESX-C-280-98 (the "Consolidated Cases").  Mr. Frumento participated in the representation of the Licata Parties in the Titan case and attended hearings in that matter prior to his behind-the-scenes participation in many of the events described below.

5.      Defendant, Chicago Title Insurance Company is a Missouri corporation with a principal place of business in Roseland, New Jersey.

## OTHER ENTITIES AND PEOPLE RELEVANT
## TO THE CLAIMS AGAINST DEFENDANTS

**The "Licata Parties."**

6.      Upon information and belief, James Licata was a citizen of the State of Connecticut, and resided  at 23 Meeting House Road (Fairfield County), Connecticut 06831. Upon information and belief, Mr. Licata now resides in the State of Florida at 13506 Montclair Place, Lakewood Ranch, Florida  34202-2430.  Mr. Licata has been a defendant in numerous lawsuits filed in the Superior Court of New Jersey, including the Consolidated Cases.  Mr. Licata also has been a debtor in bankruptcy proceedings before the United States Bankruptcy Court for the District of Connecticut, the first of which proceedings was filed in late June 2002.

7.     Upon information and belief, Cynthia Licata is a resident of the State of Florida and was married to James Licata.

8.     First Connecticut Consulting Group, Inc. ("FCCG"), was a Connecticut corporation with a principal office at 301 Merritt 7 Corporate Park, Norwalk (County of Fairfield), Connecticut 06851.  It was controlled by James Licata, and upon information and belief, jointly owned by James Licata and Cynthia Licata.  FCCG is a debtor in liquidation before the United States Bankruptcy Court for the District of Connecticut.

**The "SWJ Players."**

9.     SWJ Holdings LLC was a Delaware limited liability company having its principal place of business at 219 East 69th Street, New York, New York.  As the result of a sale which took place in the Connecticut Bankruptcy Court and pursuant to certain orders issued by that court, SWJ acquired "all claims, defenses, and interests" of James and Cynthia Licata as they relate to the various real estate and other assets involved in the Consolidated Cases "subject to all existing claims, defenses and interests of the Mocco Parties".  As the result of the bankruptcy sale, SWJ became the successor-in-interest to James and Cynthia Licata, having no greater rights than the Licatas had.  On information and belief, the members of SWJ, directly or indirectly, are Stephen Podell (the "S" in SWJ), William Mournes (the "W" in SWJ), and James Licata (the "J" in SWJ).

10.    Subsequent to acquiring the Licata assets in the bankruptcy sale, SWJ defaulted in payments for those assets, was sued by the bankruptcy Trustees for Licata and FCCG and eventually went into bankruptcy and appears to have ceased all business.  On May 2, 2008, the Bankruptcy Court in Connecticut granted the Mocco Parties relief from the automatic stay in the

SWJ case so that the Moccos could proceed with all their claims in the Consolidated Cases related to FCHG IV.

11.     Stephen Podell is a resident of the City and State of New York and the managing member of SWJ.  William Mournes resides at 35 Bird Run Avenue, Denville, (Morris County), New Jersey, 07834.  Mournes is a member of SWJ, either directly as an individual, or indirectly as the managing member of Cobra/Ventura Equities LLC.

12.     Cobra/Ventura Equities LLC is a New Jersey limited liability company having business offices c/o Mr. Mournes in Denville (Morris County) New Jersey, is a member of SWJ, and is a guarantor of SWJ's promissory notes given as part of the purchase of the Licata assets.

**The "Proskauer Parties"**

13.     Dale Schreiber is a resident of the City and State of New York, a lawyer, and a member of the firm of Proskauer Rose LLP.  Most recently, Mr. Schreiber has acted as counsel to SWJ.  In the past Mr. Schreiber has represented James Licata, invested with James and Cynthia Licata in business transactions, and has sued James Licata.  In addition, Schreiber and Proskauer Rose represented Licata and FCCG when Licata and FCCG were acting as agents for the Moccos.  For those services, Proskauer was paid approximately $250,000 by the Moccos.

14.     Proskauer Rose LLP is a law firm with its principal office in New York City and a New Jersey office in Newark.  At all relevant times, the activities of Proskauer, with respect to the transactions that are the subject of this case, were directed and supervised by Schreiber.

**Other "Connecticut-Based Parties"**

15.     Herbert Blake is a resident of the State of Connecticut and a disbarred attorney in that state.  Upon information and belief, Blake has rendered financial and advisory services to Licata, SWJ and/or its principals.

16.     Daniel Shepro is a resident of the State of Connecticut and a lawyer practicing under the laws of that state.  Shepro has represented Cynthia Licata in certain litigation arising out of her husband's bankruptcy case and in other matters and has acted as "attorney-in-fact" for Cynthia Licata in connection with at least one of the transactions outlined herein.

**"Horizon Title"**

17.     Horizon Title Agency, Inc. was a New Jersey corporation with a principal place of business in River Edge, New Jersey.  Horizon was at all relevant times an agent of Defendant Chicago Title.

18.     David Cohn is a resident of the State of New Jersey.  At all times relevant herein, Cohn was employed by Horizon Title.

**The "West Coast Lenders"**

19.     Upon information and belief, Centrum Financial Services, Inc. is a corporation organized under the laws of the state of Washington with a principal place of business in Seattle Washington.

20.     Upon information and belief, U.S. Bank, National Association is a banking association formed under the laws of the United States with a principal place of business in Bellevue, Washington.

21.     Upon information and belief, First Mutual Bank is a banking corporation formed under the laws of the state of Washington with a principal place of business in Bellevue, Washington.

22.     Upon information and belief, Key Bank is a banking association formed under the laws of the United States.  Upon information and belief, Wells Fargo is the successor by assignment of the asserted lien formerly held by Key Bank upon the assets of FCHG IV.

**The "East Coast Investments Players"**

23.    Upon information and belief, East Coast Investments, LLC is a limited liability company formed under the laws of Florida.  The principals of East Coast Investments include members of the Tampa, Florida law firm, formerly known as Cohen, Jayson and Foster, and persons associated with that firm.  The law firm of Cohen, Jayson and Foster served as defense counsel to James Licata in U.S. v. Licata, District of Connecticut, Case No.:  3:06-cr-0075 (EBB).

24.    Upon information and belief, Elliot Buchman is or was a principal of East Coast Investments, LLC, with authority to act on its behalf.

**The "Trustees"**

25.    Richard Coan is an attorney at law practicing and living in the State of Connecticut.  Mr. Coan is the duly serving Trustee for the bankruptcy estate of FCCG.

26.    Ronald Chorches is an attorney at law practicing and living in the State of Connecticut.  Mr. Chorches is the duly serving Trustee for the bankruptcy estate of James J. Licata.

## JURISDICTION AND VENUE

27.    Defendant Aegis Frumento is subject to personal jurisdiction in the State of New Jersey because he has appeared in this Court and subsequently in direct violation of orders of this Court has committed tortious acts designed and intended to cause damage to businesses, real properties and individuals located in the State of New Jersey and which in fact have caused injury in New Jersey.  Defendant Chicago Title is subject to personal jurisdiction here because (i) Chicago Title conducts business and maintains offices here in the State of New Jersey, (ii) Chicago Title's agent, Horizon Title, at all times relevant herein, conducted business and

maintained an office in the State of New Jersey, and (iii) David Cohn, the employee of Chicago

Title's agent, Horizon Title, is a resident of the State of New Jersey.

28.     Venue is proper in this action because it is closely related and connected to the

Consolidated Cases already pending before the Hon. Paul J. Vichness, J.S.C. and because

Chicago Title is headquartered in Essex County.

## ALLEGATIONS COMMON TO ALL COUNTS

**A.      The Litigation History of the Related Consolidated Cases and the Licata
          Bankruptcy Cases**

29.     The Consolidated Cases are, at this time, five cases consolidated before the

Superior Court of New Jersey, Chancery Division, Essex County, Titan Management, L.P., et al.

v. Licata, et al., ESX-C-280-98; Peter Mocco, et al. v. Licata, et al., ESX-C-397-99; EMP Whole

Loan I v. Village Townhouses, Inc., et al., ESX-C-396-99; Titan Management, L.P. v. First

Connecticut Holding Group, LLC XXVI, et al., ESX-C-399-99; and EMP Whole Loan I v.

Lorraine Mocco, et al., ESX-C-6-00.

30.     The Consolidated Cases originally involved disputes among three distinct groups

of parties, which, for convenience, have been referred to throughout the litigation as the "Titan

Parties", the "Licata Parties" and the "Mocco Parties." Now the Consolidated Cases, through

amendments, include many of the entities and people listed above as having relevance to the

claims herein.

31.     Specifically, among the major issues originally in dispute in the Consolidated

Cases was a dispute between the Mocco Parties and the Licata Parties as to who owned certain

New Jersey limited liability companies, which LLCs, in turn, held title to extremely valuable

parcels of real estate located in Hudson and Middlesex counties.  The first group of these LLCs

included:

- FCHG II – which owns real estate in Jersey City, New Jersey on which an entity known as Hamilton Park Health Care Center Ltd. (owned 100% by Lorraine Mocco) operates a 250-bed nursing home and sub-acute care facility.

- FCHG III – which owns real estate in Jersey City, New Jersey that is leased to an entity known as A-1 Self-Storage and that operates a self-storage business at that location. A-1 Self-Storage is owned by Peter Mocco.

- FCHG IV – which owns and rents a portfolio of multi-family dwellings in Jersey City and North Bergen, New Jersey and which is owned 100% by Lorraine Mocco.

- FCHG X and XI – which each own and rent portfolios of rental apartments and townhouses in Jersey City, New Jersey and each of which is owned 100% by Lorraine Mocco; and

- FCHG XIII – which owns an approximately 140-acre development site in Sayreville, New Jersey, and which is owned 100% by Lorraine Mocco.

- Collectively, these six LLCs have been and continue to be referred to as the so-called "Holding Entities".

32.     The Holding Entities were all formed in or about September 1996 for the purpose of taking and holding title to the real estate that Peter and Lorraine Mocco owned at that time. In September 1996, the Moccos were both debtors-in-possession in reorganizations pursuant to Chapter 11 of the United States Bankruptcy Code and the real estate owned by these Holding Entities was being pledged as collateral for a loan of approximately $22 mil. that was needed to fund the Moccos' plan of reorganization. The lender for that loan, EMP Whole Loan I (a party to the Consolidated Cases) insisted that title to the LLCs be held by someone who was

"bankruptcy remote".  To satisfy EMP's requirements, and for ease of administration, the membership interests in the LLCs were issued in Licata's name pursuant to a written agreement that he would act as the Moccos' nominee for this purpose and that title would be transferred to Mocco or his designee as each property was permanently refinanced and EMP's loan was paid down.

33.     Lorraine Mocco's sole ownership of the Holding Entities, and the Licatas' lack of any interest in Holding Entities or their properties has been adjudicated by the United States Bankruptcy Court by order and judgment filed July 27, 2004, affirmed by the United States District Court for the District of Vermont and by the United States Court of Appeals for the Second Circuit, in the Licata bankruptcy cases, as more fully set forth below.

34.     The second major ownership dispute in the Consolidated Cases involves the "Schedule C properties".  The reference here is to Schedule C attached to a joint venture agreement between Peter Mocco and James Licata dated January 28, 1998.  The joint venture agreement provided that certain properties listed on Schedule A to the joint venture agreement were being contributed to the joint venture by Mocco or Licata; that certain properties listed on Schedule B to the joint venture agreement would be contributed once acquired; but that properties on Schedule C would not be contributed to the joint venture unless, and then only to the extent that, a further written agreement was reached to include those properties in the joint venture.  That Schedule C to the joint venture agreement lists three properties, each of which had been owned by the Moccos for many years before the joint venture agreement was signed:

> •     Liberty Harbor is a 40-plus acre urban redevelopment site on the Jersey
>       City waterfront held by Liberty Harbor Holding LLC.  Peter Mocco has at all
>       relevant times, been the sole member of that LLC.  Peter Mocco started assembling

the land for Liberty Harbor in 1985 pursuant and subject to a redevelopment agreement with the Jersey City Redevelopment Agency ("JCRA") which agreement, among many other restrictions, precludes Mocco from transferring any interest in the property without the JCRA's prior written approval.

- The Atrium (referred to on Schedule C as the "Assisted Living Facility"), is owned by The Atrium at Hamilton Park Urban Renewal Associates LLC. Lorraine Mocco has, at all relevant times, been the sole member of that LLC. At the time of the Joint Venture Agreement The Atrium was a development site. Today, The Atrium is a 110-bed assisted living facility adjacent to and run in conjunction with the Hamilton Park Nursing Home. This Court dismissed Licata's lis pendens on The Atrium by order filed September 24, 2001.

- Fulton's Landing was owned by Fulton's Landing Urban Renewal Company, LLC at the time the Joint Venture Agreement was entered. Fulton's Landing was a development site for a 100-plus unit residential building in lower Jersey City, adjacent to Liberty Harbor, on the property where Robert Fulton is believed to have invented the first steamboat. Peter Mocco is and was, at all relevant times, the sole member of Fulton's Landing Urban Renewal Company, LLC. Today, Fulton's Landing is a fully constructed occupied residential building. Peter Mocco sold this property, before completion of construction, to a third party many years ago. Prior to that date, this Court had dismissed Licata's claim of an interest in Fulton's Landing by Order dated April 29, 2002.

35. The Schedule C properties were, at the time of the Joint Venture Agreement, all sites for prospective development which the Moccos had owned for years. Licata had expressed

10

a desire to acquire an interest in those properties and to participate in that development process. In order to avoid any possible misimpression that these properties were being contributed to or put into the joint venture by Mocco, these three properties were separately scheduled on Schedule C to the Joint Venture Agreement and the Joint Venture Agreement expressly provided as follows:

> "WHEREAS, there are other assets owned by one Joint Venturer, which the Joint Venturers wish to have included among the Joint Venture Assets, upon and to the extent the Joint Venturers arrive at a separate written agreement regarding the inclusion of those assets, which other assets are listed on Exhibit "C" annexed hereto (the "Additional Existing Assets").

No such separate written agreement was ever agreed upon and no such separate written agreement was ever put in writing and signed by the parties. There is no such agreement for any of these three properties, and the Schedule C properties were never contributed to the joint venture or required to be contributed to the joint venture.

36. Despite the total absence of any agreement that would satisfy the conditions of the Joint Venture Agreement, Licata persisted, for the many years of litigation in this Court in the Consolidated Cases, to assert his baseless claim that the Schedule C properties were joint venture assets and even filed lis pendens on these properties.

37. Because the lis pendens Licata wrongfully filed obstructed the financing and development that was the purpose for acquisition of these properties by the Moccos, the Moccos moved before the Chancery Division to discharge them. By Order dated September 24, 2001, the Chancery Division voided and discharged the lis pendens that Licata had filed on The Atrium property. By Order dated April 29, 2002 the Chancery Division not only vacated lis pendens on Fulton's Landing, but dismissed all claims by Licata against that property. Since then no

application to the Court has ever been made by Licata or his successors in interest, to reinstate those claims on those lis pendens.

38.      Following dismissal of the Fulton's Landing claims and discharge of the lis pendens on The Atrium, attorneys for the Mocco Parties in the Consolidated Cases moved for summary judgment before the Chancery Division including dismissal, with prejudice, of all Licata ownership claims against the Holding Entities and the Schedule C properties.  These motions were returnable in May 2002.

39.      Up to this point, that is, up to the point of Licata's initial bankruptcy filing and presumably beyond that point, Frumento's then existing law firm, Singer Frumento, acted as counsel to the Licata Parties in Titan v. Licata, the first of the five Consolidated Cases. Frumento was personally involved and active in that case and appeared in Court on behalf of the Licatas.  Frumento was personally aware of all activity in the Consolidated Cases, including Orders entered by the Court.

40.      Licata did not file any opposition to the motion to dismiss but instead applied for repeated adjournments of the motion, with the final adjourned date being at the end of June 2002. A few days before that final adjourned return date of these dispositive motions, Licata filed Chapter 11 bankruptcy petitions for himself, in Florida, and for his principal operating company, First Connecticut Consulting Group, in Connecticut.  Because Florida was a patently inappropriate choice of venue, the Florida Bankruptcy Judge, at the request of the Office of the United States Trustee, quickly transferred Licata's personal Chapter 11 to Connecticut where it was consolidated (procedurally) with the FCCG case.

41.      Licata then went on a bankruptcy filing binge, eventually filing over 25 bankruptcy cases, including cases for virtually every LLC with which he had ever been

connected in any business. Licata filed cases for LLCs that had long before conveyed all their assets and were effectively out of business. Licata filed cases for LLCs whose real estate assets were in foreclosure or in the custody of a court-appointed Receiver and cases in which the LLCs clearly had no equity in the real estate. He filed cases for LLCs that he did not own and which were perfectly sound and solvent, paying their bills as they came due.

42.    Licata's clear and obvious purpose in most, if not all, of these bankruptcy filings, was to hinder, delay, harass and obstruct his many creditors and to interfere with the Moccos in the operation of their businesses. Well in excess of $100 mil. in claims were filed against the bankruptcy estates of Licata and his principal operating company, First Connecticut Consulting Corp. (FCCG). The vast majority of these claims (in value) included allegations of fraud and objections to Licata receiving a bankruptcy discharge.

43.    Fifteen of Licata's bankruptcy filings were clearly pointless and improper and were voluntarily dismissed by Licata's second bankruptcy counsel in 2003 after the Moccos moved to dismiss them. Five more of those filings were, following the February 2004 trial discussed below at paragraphs 60 through 63, found to be both unauthorized filings and bad faith filings. The five bankruptcy cases at issue in the February 2004 trial (the "Vermont trial") are the cases which Licata caused to be filed for FCHG II, III, X, XI and XIII. The trial court found, in its final judgment filed July 27, 2004, that all of these entities were owned 100% by Lorraine Mocco.

**B.    The September 21, 2001 Order**

44.    On September 1, 2001 after the Consolidated Cases had been pending for approximately two and one-half years, but before the Licata Parties filed their bankruptcy cases, Pieter de Jong delivered to Peter Mocco certificates of membership interest previously executed by him pursuant to a power of attorney from the Licatas reflecting the fact that 100% of all the

membership interests in the Holding Entities (FCHG II, III, IV, X, XI and XIII) had been issued to Lorraine Mocco.  In addition, Mr. de Jong delivered to Mr. Mocco all of the essential structural documents for these entities, including the registers reflecting ownership and transfers of the membership interests.

45.     Prior to September 1, 2001 the Licata Parties, supported by Mr. de Jong, had insisted that all the Holding Entities were in fact owned by the Licatas and that there was no agreement to re-convey them to the Moccos.

46.     On September 1, 2001, however, Mr. de Jong also produced the original executed agreement to re-convey the properties to Mocco (this agreement is sometimes referred to as the "3-page agreement" or the "nominee agreement") and a fully executed copy of the May 1, 1997 "Escrow Agreement" which Mr. de Jong said he had recently discovered while cleaning some old files.  These agreements were the central issue in the Vermont trial.

47.     The Licata Parties who had previously denied the existence of these agreements then took the position that re-conveyance of the Holding Entities to the Moccos was precluded by the terms of the confirmation order in the Moccos' prior bankruptcy case and requested permission to present that issue to the New Jersey Bankruptcy Court, which had confirmed the Mocco reorganization plan.

48.     On September 21, 2001, the Court entered an Order, which among other things, granted the Licata Parties a limited period of time to file an application with the United States Bankruptcy Court in furtherance of their assertions that re-conveyance of the Holding Entities was prohibited by the Bankruptcy Code.  In that same Order, without disturbing the completed transfers of the legal title to the beneficial owners, but in order to preserve the status quo while the application was made to the bankruptcy court, this Court also directed as follows:

> Pending further order of this Court, or should the
> Bankruptcy Court assume jurisdiction of this matter, the
> order of the Bankruptcy Court, no party or any affiliate of a
> party shall transfer, lien, or encumber any interest in any of
> the Holding Entity LLCs or any properties owned in the
> name of any such Holding LLCs.

Aegis Frumento was fully aware of the entry of this order.

### C.    Licata's Move To Bankruptcy Court

49.    The Licata Parties did not file their motion in the Mocco bankruptcy cases within the 28 days provided for in the September 21, 2001 Order. The proffered reason for this delay was that Podvey Sachs, the second law firm to represent Licata in those cases, was moving to be relieved as counsel and Licata needed time to find new counsel.

50.    Although the Licata Parties failed to retain another law firm to appear on their behalf in the Consolidated Cases, they did retain the firm of Bisceglie & Friedman of Newark to represent them in an application to the bankruptcy court which sought the same relief that had been sought in the consolidated cases on the issue of who owned the Holding Entities.

51.    By Order dated March 19, 2002, the Honorable Raymond T. Lyons, United States Bankruptcy Judge for the District of New Jersey, refused to reopen the Moccos' bankruptcy cases and denied the Licata motion.

52.    After another month and a half of waiting for the Licata Parties to retain new counsel, on May 7, 2002 the Moccos moved in this Court for the entry of a judgment against the Licata Parties on a variety of procedural and substantive grounds. That motion was originally scheduled for argument on May 31, 2002, but was adjourned to accommodate prospective new counsel with whom the Moccos were told Mr. Licata was then having discussions.

53.    While this Court and counsel were waiting for Mr. Licata to find and retain new counsel to represent the Licata Parties in that litigation, and while the motion to dismiss his

claims and affirmative defenses was pending, Mr. Licata in fact retained counsel in Florida to file a personal Chapter 11 petition for him in the United States Bankruptcy Court for the Middle District of Florida (Tampa) on June 27, 2002. He also retained counsel to file a Chapter 11 for First Connecticut Consulting Group in the District of Connecticut on June 28, 2002.

54.    The Moccos and other parties in the Consolidated Cases only learned of these filings a few days later while in the midst of depositions under the supervision of this Court's Special Fiscal Agent.

55.    The Licata filing in Florida (accompanied by a flurry of applications for emergent relief against the Moccos and their counsel, all of which failed) was an utterly inappropriate choice of venue and the Florida Bankruptcy Court responded very promptly with an August 30, 2002 order transferring the Licata personal Chapter 11 case to the bankruptcy court in Bridgeport, Connecticut where the FCCG case was already pending.

56.    Thereafter, in September of 2002 Licata caused numerous other Chapter 11 petitions to be filed by various LLCs in which he claimed an interest. Eventually, he filed over 25 bankruptcy petitions.

### D.    The Mocco/Licata Ownership Conflict in the Bankruptcy Court

57.    Among the many Chapter 11 cases which Licata filed in Connecticut were cases for LLCs that no longer were in business, that had already lost or were about to lose their only real estate assets in foreclosures, and LLCs that the Moccos contended were their property for which they had not authorized a filing. This last category consisted of LLCs that were the subject of the litigation pending here in New Jersey and for which the title documents were being held by the Special Fiscal Agent.

58.    On or about March 19, 2003, the Mocco Parties moved before the bankruptcy court in Bridgeport, Connecticut for dismissal of 21 of the bankruptcy cases that Licata had filed.

Eventually, new bankruptcy counsel for the Licata Parties consented to dismissal of 15 of those 21 cases. Those 15 cases involved LLCs that had no assets and no business at the time of filing. As to one case, FCHG XXIII, the Mocco Parties withdrew their motion to dismiss because the debtor's counsel had made a deal with the secured creditor, LaSalle National Bank, pursuant to which the debtor would consent to an order lifting the automatic stay and allowing LaSalle to finish its foreclosure action in this Court, in exchange for a payment of $110,000 to the FCHG XXIII bankruptcy estate. Since both LaSalle and the debtor wanted that deal, the Moccos withdrew their motion as to that entity.

59.     At that point, what remained was the Mocco motion to dismiss the Chapter 11 cases filed for FCHG II, III, X, XI and XIII. Each of those entities owned real estate connected with a major Mocco business operation or development project. The Mocco position was simply that Lorraine Mocco owned these five entities and James Licata had no authority to file Chapter 11 petitions for them and that none of them were in need of bankruptcy relief. This ownership dispute was one of the major issues that had been litigated in the Consolidated Cases prior to the imposition of the bankruptcy stay which issued automatically in June of 2002 when Licata and FCCG filed their petitions.

60.     When it became clear that the dispute as to ownership of these entities would have to be tried, the bankruptcy judge in Bridgeport advised the parties that he would not be able to give the time needed to try this dispute. The result was that, with the assistance of the administrative staff of the United States Court of Appeals for the Second Circuit, and with the consent of the parties, the Connecticut Bankruptcy Court referred the case for trial by the Honorable Colleen A. Brown of the United States Bankruptcy Court for the District of Vermont sitting in Rutland, Vermont.

61.    After full discovery, that trial took place over eight trial days in February 2004. On July 27, 2004 Judge Brown rendered her decision and entered an order granting the Moccos' motion to dismiss. In her 21 page Memorandum of Decision Judge Brown made many specific and relevant findings of fact and conclusions of law. Of paramount relevance and importance are her findings that "Licata's interest in the subject properties never exceeded that of a nominee".

62.    The following facts were found, and conclusively and necessarily determined by the Vermont Bankruptcy Court in its judgment filed on July 27, 2004. That judgment was then affirmed by the United States District Court for the District of Vermont on March 28, 2006 and by the Court of Appeals for the Second Circuit on November 25, 2007:

    a.    FCHG II, III, IV, X, XI and XIII were all formed in or about September of 1996 in connection with the financing and confirmation of the Chapter 11 Joint Plan of Reorganization for Peter and Lorraine Mocco before the United States Bankruptcy Court for the District of New Jersey.

    b.    James Licata and First Connecticut Consulting Group, Inc., his principal operating company, were loan brokers. Hamilton Park Health Care Center Ltd. (a Mocco-owned company that was not in bankruptcy) retained Licata and First Connecticut Consulting Group, Inc. to assist the Moccos in finding so-called "bridge financing" sufficient to make a deal with the largest Mocco creditor, First Union Bank, which was the only Mocco creditor that had not yet accepted the Mocco Joint Plan of Reorganization.

    c.    Eventually, an agreement was reached pursuant to which First Union would sell or release its claim for $22 mil. to be paid immediately.

18

   d. Licata found a lender, EMP, to provide bridge financing to take out the First

Union position on behalf of the Mocco Parties, and EMP's loan agreement specified that the loan

would be made to the Moccos. However, at the last minute, EMP stated it would not loan

directly to an entity or person that was in a bankruptcy proceeding, so it was agreed that all of the

properties that Mocco then owned would be conveyed to newly-formed limited liability

companies, ownership of which would be placed in James Licata as Mocco's nominee. The

ownership certificates for these properties would then be pledged as collateral to EMP who

would loan approximately $22 mil. to Licata, who would then pay that money to First Union in

exchange for their claims. It was further agreed that all repayment of the loan would come from

the Moccos or their various operating businesses, as well as through refinancing of the individual

Mocco properties with permanent long-term loans. Licata confirmed his nominee status in a

three-page agreement he signed at the time of the closing of the EMP loan.

   e. On September 25, 1996 and into the early morning hours of September 26,

the EMP loan closed, the Mocco properties were transferred to the Holding Entities, the

membership shares of the Holding Entities were issued in the name of the Licatas and then were

immediately assigned to EMP as collateral for its loan.

   f. Licata received the $22 mil. loan proceeds and the following morning,

September 26, 1996, Licata's attorney, Pieter de Jong, delivered the funds to First Union's

counsel who assigned all of First Union's claims to Licata's company, FCCG, which then

appeared that same morning in the bankruptcy court to vote in favor of the Mocco Plan of

Reorganization which was then confirmed by the Bankruptcy Court.

   g. Subsequent to the confirmation of the Mocco Plan, Mocco immediately set

about refinancing the properties and paying off EMP's bridge loan.

h.    As Mocco properties were refinanced with long-term loans secured by a first

mortgage on their real estate, the full proceeds of those loans were paid to the bridge lender,

EMP, who in turn released the membership certificates for the entity that owned the real estate

being refinanced.  However, unbeknownst to the Mocco Parties, EMP and its affiliates, (the

Titan Parties), were kicking back millions of dollars from those repayments to Licata and FCCG,

Mocco's agents.  In addition, EMP and Licata and FCCG imposed unauthorized fees and

expenses having the effect of reducing the amounts applied to the obligations, increasing the

burden on the Mocco Parties, and yielding millions of dollars in kickbacks to Licata, in breach of

his duties as Mocco's agent.

i.    Upon refinancing of the properties and pay-down of the EMP loan, the

membership certificates were released to Licata's counsel, Pieter de Jong.  Pursuant to the

nominee agreement and a subsequent related escrow agreement, de Jong was then authorized and

obligated, for a consideration of $1.00, to re-issue the certificates in the name of Peter Mocco or

his designee.  In each instance, Peter Mocco designated Lorraine Mocco as the person to whom

the new membership certificates should be issued.

j.    Eventually, after much delay and two and one-half years of litigation, on

September 1, 2001, Pieter de Jong delivered the membership certificates in favor of Lorraine

Mocco, as well as all related organizational and structural documents of the entities, to Peter

Mocco.

k.    All payments made on or in connection with the bridge loans or the

permanent financings that replaced them were made by the Moccos or one of their operating

companies.  At no time did any of the Licata Parties pay any of these obligations or any of the

expenses incurred in connection with them.

l.       In addition, the Moccos had paid Licata and FCCG substantial fees for their

services and, unbeknownst to the Moccos, Licata received millions of dollars in compensation

from EMP, the lender, by EMP secretly sharing with Licata the points and fees that EMP was

charging Mocco.

63.      The Licata Parties, after another change of counsel, appealed from Judge Brown's

decision.  On March 28, 2006 the Honorable William K. Sessions, III, Chief Judge of the United

States District Court for the District of Vermont, affirmed Judge Brown's decision in all respects

in a 25-page opinion of his own.  After Judge Sessio0ns rendered his decision, SWJ was

substituted as successor to the Licata interests and filed an appeal to the Court of Appeals for the

Second Circuit.  On November 15, 2007, the Court of Appeals affirmed the decisions below.

**E.**      **Licata's Sale Strategy**

64.      Following Judge Brown's decision in Vermont, and while the appeal was pending

to the District Court for Vermont, Licata with the assistance of his co-defendants in the

Consolidated Cases and Defendant Aegis Frumento and Defendant Chicago Title, embarked

upon a new course.  They commenced efforts to sell all of the assets which Licata claimed to

own to the full extent that he owned them including, in particular, all Licata claims against the

Mocco Parties and their assets.

65.      In May 2005 the Licata debtors in the Connecticut bankruptcy court, together

with Cynthia Licata, entered an agreement with an entity known as SWJ Holdings, LLC.  This

agreement came to be known as the First Amended Asset Purchase Agreement or "FAAPA".

The FAAPA, as required by section 363 of the Bankruptcy Code, 11 U.S.C. § 363, was subject

to higher and better offers and approval of the final sale by the bankruptcy court.

66.      The assets being conveyed under the FAAPA, of course, only included, and could

as a matter of law only include, the Licatas' own interests or claims.  They did not and could not

include assets which by law, belonged to the Moccos. As stated by counsel for the creditors'
committee, a proponent of the sale:

> MR. BRODY: Alan Brody for the creditors committee.
> Your Honor, the debtor is selling whatever interest it has, if
> it has any interest, in the assets that are listed in the
> schedules.
>
> To the extent it does not have an interest, does not own part
> or all of the assets, that's not being sold. So, what we mean
> by that, Your Honor, is - - and I think this is what Mr.
> Goldman was looking for - - we're not creating any
> substantive rights. To the extent that an asset is transferred
> to the purchaser, the only asset they can - - only the
> debtor's interests in that asset are being transferred.
>
> To the extent that Mr. Mocco or anybody else claims an
> ownership in the assets, that ownership is preserved; the
> ownership interest is preserved. There's no transfer of that
> asset over somebody else's ownership interest.

67.     The FAAPA did not purport to transfer interests in specific properties. To the

contrary, it listed among the properties being sold Licata's interest in the "Joint Venture

Agreement dated 1/28/98. . .and any asset of the joint venture. . .in which James Licata has any

interest." (FAAPA Exhibit A). The FAAPA did not contend that Licata in fact had any interest

in any of the joint venture properties. It asserted that Licata claimed that "the joint venture . . .

holds . . . some interest in," inter alia, Liberty Harbor, Fulton's Landing and the Atrium (the

"Schedule C" properties). Id.

68.     Due to these ambiguities in the FAAPA, and in response to objections by the

Mocco Parties and others to the FAAPA, the June 21, 2005 Order approving the FAAPA

included a provision, Paragraph Q, which stated *inter alia* that, notwithstanding the Licata

Parties' claim of an interest in various properties through the Joint Venture Agreement, those

assets were not being conveyed under the FAAPA; specifically, that ". . .the following

agreements ('Litigated Agreements') shall not be assumed contracts under this order or the APA: (i) Joint Venture Agreement dated 1/28/98 made effective 5/1/97. . .as amended; (ii) Limited Liability Company operating agreement for Diversified Venture Capital Investments Group, LLC."

69.    On June 21, 2005, an auction was held in the bankruptcy courtroom in Bridgeport, Connecticut. At that auction, SWJ was the successful bidder at a price of $8,950,000.

70.    Notwithstanding the fact that the FAAPA provided that the closing should take place on or before June 27, 2005, and the fact that the Court's June 21, 2005 Order specifically provided that "time is of the essence in closing the transactions. . .", the closing did not take place. What followed instead were repeated delays and renegotiations of the deal with increases in the purchase price to compensate the debtors for the delays. SWJ simply did not have the money to close, notwithstanding prior assurances that SWJ was "ready, willing and able."

71.    After months of delay and repeated failures to close on scheduled closing dates, the bankruptcy court entered an Order on November 16, 2005 which, among other things, extended the closing date for SWJ to November 25, 2005, and further provided that in the event SWJ failed to close (that is, pay the purchase price) by that date, then the debtors were given the option of an alternative sale to an entity known as Enterprise Asset Management, Inc. at a lower price.

72.    Because, even as of that late date of November 16, 2005, there continued to be questions and some confusion as to just what was being sold and how it would affect the Mocco interests, the Court clarified matters in paragraph 17 of its November 16th Order as follows:

> In the event the Purchaser acquires the Acquired Assets
> pursuant to the Amended FAAPA, notwithstanding anything to
> the contrary contained in this Order and the Sale Order,: (i) this
> Order and the Sale Order are not intended to adjudicate or

resolve any of the claims, defenses or issues that have been and
continue to be disputed between the Moccos and their affiliated
entities (the "Mocco Parties"), and James and Cynthia Licata
and their affiliated entities (the "Licata Parties"); (ii) the
Purchaser is acquiring all claims, defenses, and interests of the
Licata Parties subject to all existing claims, defenses and
interests of the Mocco Parties; and (iii) to the extent that the
Purchaser and the Mocco Parties continue to be in disagreement
as to their respective claims, defenses and asserted interests in
the various entities and properties set forth in the FAAPA at
Exhibit A, those disputes shall either be resolved in the pending
State Court proceedings or the proceedings now on appeal to the
United States District Court for the District of Vermont,
however this Order shall not prohibit any party from bringing
any proceedings or motions before this Court which may be
properly venued in this Court.

73.     SWJ did not pay the purchase price by November 25, 2005 and Enterprise Asset

Management, Inc. after completing its due diligence, decided that it was no longer interested in

the deal.

74.     After yet another failed attempt to close in February 2006, the Connecticut

Bankruptcy Court on March 9, 2006 entered an Order extending the closing date to March 15,

2006 and modifying the terms of payment.  Prior to the March 9 Order the purchase price had

been $11.25 mil. of which $400,000 had been paid as a deposit.  The original terms provided for

payment in full at the closing.  The March 9 Order modified those payment terms to provide that

the $11.25 mil. purchase price, less the $400,000 retainer would be paid: $5 mil. on or before

March 15, 2006 and the balance in the form of a promissory note in the principal amount of

$5.85 mil., with interest at 9% due in full on or before December 15, 2006.  All of these

provisions were stated as amendments to the Court's November 16, 2005 Order.

75.     Even before the June 21, 2005 auction and sale pursuant to Section 363 of the

Bankruptcy Code, and long before the March 13, 2006 closing, at which SWJ acquired whatever

interest it claims to have acquired, SWJ commenced a series of fraudulent transactions.  On or

24

about May 25, 2005, SWJ, acting through Mournes, one of its principals, and Gordon Duval, its Utah attorney and agent, assigned a claimed interest in a mortgage on the home of Peter and Lorraine Mocco to Mourne's company, Cobra/Ventura Equities, LLC. That same day, May 25, 2005, Cobra/Ventura assigned the same mortgage to an entity called Advertising Management and Consulting Services, Inc., an Arizona Corporation. Each of these transactions occurred at a time when whatever asset was available to be sold was only an asset of the Licata/FCCG bankruptcy estates subject to a contract of sale which didn't close until the following year. No bankruptcy court approval was ever sought or obtained for this "premature" conveyance. All of these transactions were committed with actual intent on the part of all of the participants to defraud the Moccos, the bankruptcy estates, and others. Four months prior to the closing date, on November 16, 2005, SWJ assigned its purported interest in the mortgage on the home of Peter and Lorraine Mocco to an entity called Sky Land Investments, LLC in exchange for $50,000, even though SWJ had no interest in such mortgage until March 13, 2006, if at all. Neither of these fraudulent and unauthorized transfers was disclosed to the Bankruptcy Court or the Moccos. Furthermore, Defendant Chicago Title, acting through its agents, Horizon Title and Cohn, issued mortgagee title insurance policies to Advertising Management and later Skyland even though they knew or were willfully unaware of the fact that the asset supposedly being sold by Cobra-Ventura had never been transferred to Cobra-Ventura and could not be legally transferred until the 363 auction took place and an appropriate order was entered.

76.     At the hearing on March 8, 2006, the Court made unambiguously clear its intentions respecting the scope of the assets conveyed in the proceedings leading to the March 9, 2006 Order that all ownership claims and disputes were preserved for future resolution.

77.     Finally, on or about March 13, 2006, the sale to SWJ closed pursuant to the terms of the Court's November 16, 2005 Order as modified by the March 9, 2006 Order.

78.     In these transactions, Frumento, in flagrant disregard of the September 21, 2001 Order entered in the Consolidated Cases, and contrary to the Connecticut Bankruptcy Court's specific orders preserving all of Mocco's rights and interests in the properties in which the Licatas claim to own and in contradiction to the specific factual findings in the Vermont trial, as well as Cynthia Licata's sworn deposition testimony in the Consolidated Cases, conspired with and aided and abetted Chicago Title's agents, Horizon Title and David Cohn, in creating a false paper trail for the purpose of enabling Cynthia Licata to borrow millions of dollars against real estate owned by the Moccos.

79.     On the same date, March 13, 2006, SWJ, in breach of its contractual obligations to the Licata/FCCG estates and the secured lender who had given them the $5 mil. needed for the closing, conveyed whatever rights it had just acquired in FCHG IV to Cynthia Licata for no consideration other than satisfaction of her previously abandoned and repudiated, but now reasserted, claim to an interest in that entity.

80.     By reason of these Orders of the Bankruptcy Court, SWJ became the successor to the Licata Parties claims of an interest in the Holding Entities, and the Joint Venture, and Licata's claim that Liberty Harbor, the Atrium and Fulton's Landing should be contributed to the joint venture, and this Court has jurisdiction to adjudicate those claims.

81.     Subsequently, after SWJ was put into a bankruptcy proceeding, the same Bankruptcy Court entered an order dated May 2, 2008 granting the Mocco Parties relief from the bankruptcy automatic stay to resolve the ownership disputes as to FCHG IV and its real estate.

82.     Following SWJ's default in payment of the second installment of the purchase price for the Licata assets, the bankruptcy trustees, Messrs. Coan and Chorches, sued SWJ and, on behalf of their respective estates, obtained a monetary judgment for $6.5 mil. and foreclosed against all of the assets which SWJ had acquired from the Licata/FCCG estates. As a result of that judgment, entered by the Connecticut Bankruptcy Court, whatever claims or interests against or in the various properties which are the subject of the Consolidated Cases litigation again belong to the bankruptcy estates of FCCG and James Licata.

83.     Neither the FAAPA nor the Orders of the Bankruptcy Court purported to convey the Joint Venture's interest (if any) in FCHG IV, Liberty Harbor, the Atrium or Fulton's Landing, only Licata's claimed interest, if any, in the entities that owned these projects.

**F.      The Wild Deed Scam**

84.     Immediately after closing the so-called sale of assets, James Licata, SWJ, Podell, Mournes, Schreiber, Proskauer Rose, Defendant Chicago Title's agent, Horizon Title and Defendant Aegis Frumento, and possibly others yet unknown to Plaintiffs, prepared, executed and recorded a series of deeds and other documents which were totally inconsistent with the Bankruptcy Court's Orders approving the sale and which were blatant attempts to circumvent prior orders of the Superior Court of New Jersey in the Consolidated Cases.

85.     On March 13, 2006, the Licata and SWJ players prepared and recorded what purports to be a deed from The Atrium at Hamilton Park Urban Renewal Associates LLC conveying all of that entity's interest in certain Jersey City real estate to SWJ. The deed is executed on behalf of The Atrium by:

> **"JAMES J. LICATA**
> **ASSERTED BENEFICIAL OWNER OF 50% MEMBERSHIP**
> **INTEREST"**

The deed also contains the following statement in boldface type:

**"THIS TRANSFER IS BEING MADE PURSUANT TO A
SALE ORDER OF A FEDERAL BANKRUPTCY COURT".**

86.     No "Bankruptcy Court" ever ordered the sale of any assets of The Atrium at

Hamilton Park Urban Renewal Associates LLC. The Bankruptcy Court ordered only the sale of

"all claims, defenses, and interests of the Licata Parties, subject to all existing claims, defenses

and interests of the Mocco Parties." The draftsman and other persons responsible for this deed

were fully aware of that Order when they falsely represented that the Deed was being made or

delivered "pursuant to a sale order of a federal bankruptcy court". They prepared the deed in this

manner to circumvent or violate the terms of the Bankruptcy Court's ruling that all of Moccos

rights, title, claims and interest would be preserved, to mislead third parties in respect to the

rights acquired by SWJ, and to avoid prior orders the Court in the Consolidated Cases of which

they were or should have been aware.

87.     Moreover, because Licata's claim under the Joint Venture Agreement, if ever

sustained, would have been to, at most, a 50% interest in the LLC which owned The Atrium, and

the Joint Venture Agreement specified that any properties subject to the joint venture could not

be disposed of without joint written consent of both venturers, Licata did not have authority to

convey ownership of The Atrium to SWJ. SWJ was in possession of the Joint Venture

Agreement as Exhibit D to the FAAPA, and so was fully aware of the absence of any power or

authority on the part of Licata individually to act for or bind the joint venture.

88.     Approximately five years prior to the recording of this deed, the Licata Players

had filed a lis pendens against The Atrium's property. That lis pendens was discharged by an

Order dated September 24, 2001 entered in the Superior Court of New Jersey, Chancery

Division, Essex County, in the Consolidated Cases for the simple reason that Licata could not

show the requisite likelihood that he would prevail on his ownership claim.

89. Lorraine Mocco owns 100% of the membership shares of The Atrium at Hamilton Park Urban Renewal Associates LLC.

90. Recording of this deed conveying title to The Atrium property was a bad faith attempt to circumvent the Court's Order in the Consolidated Cases dated September 24, 2001 discharging the Licata lis pendens.

91. Also on March 13, 2006, the Licata and SWJ Parties prepared and recorded what purports to be a deed from Liberty Harbor Holding, LLC conveying property owned by that entity in the city of Jersey City to SWJ. This deed, like The Atrium deed, was executed by:

> **"JAMES J. LICATA**
> **ASSERTED BENEFICIAL OWNER OF 50% MEMBERSHIP**
> **INTEREST"**

This deed, again like The Atrium deed, contained a statement in boldface type:

> **"THIS TRANSFER IS BEING MADE PURSUANT TO A**
> **SALE ORDER OF A FEDERAL BANKRUPTCY COURT".**

92. No "Bankruptcy Court" ever ordered the sale of any assets of Liberty Harbor Holding, LLC. The Bankruptcy Court ordered only the sale of "all claims, defenses, and interests of the Licata Parties, subject to all existing claims, defenses and interests of the Mocco Parties." Furthermore, the redevelopment agreements pursuant to which Mocco originally acquired these properties for Liberty Harbor Holding preclude any such transfer. The draftsmen and other persons responsible for this deed were fully aware that the Bankruptcy Court's Order did not direct the transfer of any real estate owned by Liberty Harbor Holding, and that such a transfer would violate the governing redevelopment agreement. Nonetheless, they prepared the deed in this matter to circumvent or violate the terms of the Bankruptcy Court's ruling and the redevelopment agreement.

93.     The only claim that Licata ever asserted against Liberty Harbor was a baseless claim that Liberty Harbor should be included as an asset of the Mocco/Licata joint venture. That Joint Venture Agreement specifies that any property subject to the joint venture could not be disposed of without joint written consent of the two joint venturers. Even if Licata's claim is well-founded (and we firmly assert that it is baseless), he or his successors in interest as purported owners of a 50% interest in Liberty Harbor would not have the authority to convey ownership of any joint venture real estate to anyone without the prior written consent of Peter Mocco, which they do not have. Licata, as well as SWJ, Podell, Mournes and Schreiber, were, and are, in possession of and fully aware of the terms of the Joint Venture Agreement.

94.     Peter Mocco is the sole owner of Liberty Harbor Holding LLC and the sole party to the contract with the JCRA with respect to the redevelopment project referred to in this pleading as Liberty Harbor; that contract prohibits assignments of interests in the property without the JCRA's written approval.

95.     On or about May 26, 2006, or shortly thereafter, SWJ, Podell, Mournes, Schreiber, Proskauer Rose, Shepro, Defendant Frumento, Defendant Chicago Title's agent, Horizon Title, and James and Cynthia Licata, caused to be prepared, executed and recorded, a deed purporting to be issued on behalf of First Connecticut Holding Group, LLC IV, transferring to SWJ all of that entity's interest in certain real property located in the Township of North Bergen and the city of Jersey City, New Jersey. The deed was executed on behalf of FCHG IV by:

**"Cynthia Licata, Member Duly Authorized by her Attorney-In-Fact Daniel Shepro, Esq."**

96.     In fact, the original membership certificates and other documents reflecting the ownership of FCHG IV are being held, and have been held since the entry of the Court's Order in the Consolidated Cases dated September 21, 2001, by that Court's Special Fiscal Agent, Dennis Drasco, Esq.  Those records reflect that the sole owner of FCHG IV is Lorraine Mocco. FCHG IV was formed at the same time, for the same purpose, by the same persons, and in the same way as FCHG II, III, X, XI and XIII.  No material facts exist which would in any way distinguish FCHG IV from FCHG II, III, X, XI and XIII.  Any claim by James or Cynthia Licata to ownership of any interest in FCHG IV, is precluded by the findings of fact and conclusions of law made by the Honorable Colleen Brown in the Vermont trial, as affirmed by the Honorable William Sessions in the United States District Court for the District of Vermont, and finally affirmed by the United States Court of Appeals for the Second Circuit on November 15, 2007.

97.     The fraudulent deeds purporting to transfer all of the real estate owned by FCHG IV to SWJ recited a purchase price of $31.3 million for essentially the same assets that SWJ had assigned to Cynthia Licata for nothing just two months earlier.  This fictitious purchase price was paid in two parts.  The first part was paid from the proceeds of a mortgage loan in the face amount of $15 million obtained from Centrum Financial, one of the West Coast Lenders.  The actual net amount received from Centrum was approximately $9.6 million after establishing certain interest and other reserves.  The remainder of the purchase price was paid in the form of a second mortgage given by the buyer to the seller, Cynthia Licata, in the amount of approximately $22 million.

98.     This transaction was a fraud on the Moccos and others.

99.     To complete the fraud scheme on the Moccos, agents of Defendant Chicago Title including Cohn, Horizon Title and others not known to Plaintiffs caused the issuance of

mortgagee title insurance on the $15 mil. Centrum mortgage and the $22 mil. Licata second mortgage, even though they knew or should have known that Mocco claimed to own and owned FCHG IV.

100.    After receiving the sham $22 million mortgage from SWJ, Cynthia Licata assigned that mortgage to East Coast Investments. Upon information and belief, the consideration given by East Coast to Cynthia Licata consisted of the legal services rendered by the lawyer members of East Coast Investments in the defense of James Licata in the Federal criminal case brought against him in Connecticut. As a result of that representation, members of East Coast Investments knew or should have known that Lorraine Mocco owned FCHG IV and that all of the transfers that led to the $22 million mortgage they were taking by assignment were fraudulent.

101.    The real market value of the real estate owned by FCHG IV does not approach $31 million. Although an escrow was established for the payment of the pre-existing first mortgage lien on FCHG IV, it has never been paid off by SWJ or Cynthia Licata. The Moccos have continually and timely serviced that debt from its inception in 1997 to the date of this pleading. Furthermore, upon information and belief, no payments have been made by SWJ on either the Centrum loans or the second mortgage.

102.    Upon information and belief, the legal fees owed by James Licata to Cohen, Jayson and Foster for that firm's representation of James Licata in the Connecticut criminal proceeding did not amount to anywhere near $22 million, the purported value of the second mortgage transferred by Cynthia Licata to East Coast Investments as payment for James Licata's legal fees.

103.    Any attempt to transfer an interest in FCHG IV's real estate is a violation of the Court's Order in the Consolidated Cases dated September 21, 2001. James and Cynthia Licata were both parties to the proceedings in which that Order was entered, and were both bound by its terms. SWJ, Podell and Mournes all acquired whatever interest they are asserting on behalf of SWJ, with full knowledge of the existence of that Order and its restrictions on transfer or encumbrance of the so-called "Holding Entities", and Schreiber and Proskauer Rose were fully aware of that Order as well. Further, Shepro, as "Attorney-In-Fact" for Cynthia Licata acted with full knowledge of the September 21, 2001 Order, and is bound by it to the same extent that Cynthia Licata is. Furthermore, Defendant Frumento, a partner at the law firm Duane Morris LLP at the time, was actively involved in the negotiation and consummation of the fraudulent sale to SWJ and fraudulent loan from Centrum. At the time, Defendant Frumento knew the Licatas' claims were without merit because his prior firm, Singer Frumento LLP, in an Answer and Counterclaim in the Titan case filed on behalf of and verified by James Licata, confirmed what Judges Brown and Sessions ruled -- that James Licata was acting as the agent of the Moccos. In addition, Defendant Frumento had full knowledge of the existence of the September 21, 2001 Order. Further still, Defendant Chicago Title's agent, Horizon Title, acted with full knowledge of the September 21, 2001 Order and, in fact, had been told by Licata's former attorney Pieter de Jong prior to the May 25-26 closing, that FCHG IV was owned by Mocco and that the Licatas had no legal interest in it. Finally, East Coast Investments and its lawyer/members knew or should have known of that order. In all of this activity, the co-conspirator defendants in the Consolidated Cases and the Defendants in this matter agreed, implicitly or explicitly, not to disclose any of their activities to the Moccos or the Court in the Consolidated Cases.

104.     On or about March 13, 2006, or shortly thereafter, James Licata, SWJ, Podell, Mournes, Schreiber and Proskauer Rose, prepared and recorded what purports to be a deed from Fulton's Landing Urban Renewal Company, LLC, conveying all of that entity's interest in certain real estate located in the city of Jersey City, New Jersey.  At the present time, that property includes both land and a 110-unit apartment house.

105.     As with The Atrium and Liberty Harbor deeds, that deed was also executed by James J. Licata "Asserted Beneficial Owner of 50% Membership Interest" and contains the same false and misleading legend to the effect that it is "MADE PURSUANT TO A SALE ORDER OF A FEDERAL BANKRUPTCY COURT".

106.     Licata as a purported beneficial owner could not convey the joint venture's interest in the asset, and no order of the Bankruptcy Court could, or did, authorize him to do so.

107.     At all relevant times, Peter Mocco has been the sole owner of all of the membership shares of Fulton's Landing Urban Renewal Company, LLC.

108.     On April 29, 2002, this Court entered an Order dismissing "all claims by James Licata against property. . .commonly known as 'Fulton's Landing'".  By that same Order, this Court vacated a lis pendens that Licata had filed against that property.

109.     More than two years later, on or about May 5, 2004, Fulton's Landing Urban Renewal Company sold the property to Pulte Urban Renewal LLC which completed construction and currently rents the apartments located at that site.

110.     At no time since entry of this Court's April 29, 2002 Order, has anyone on behalf of the Licatas or their successors in interest, attempted to amend or to cure the deficiencies of Licata's dismissed claim that Fulton's Landing is an asset of the Mocco/Licata joint venture.

111.    After creating a false and misleading record of ownership, James and Cynthia Licata, SWJ, Podell, Mournes, Schreiber, Proskauer Rose, Blake, Defendant Chicago Title's agent, Horizon Title, Defendant Aegis Frumento, David Cohn, and Shepro sought to profit and have profited from that false record by entering contracts to sell or encumber properties which none of these defendants, entities or persons owned, or to assign security interests which they did not own, to third parties who were misled by the false records and blinded by their own greed which led them to conclude that they could acquire key pieces of the Mocco real estate portfolio for a tiny fraction of their value.  In all of their efforts to sell or encumber the Moccos' properties, each of these defendants, entities or persons acted with knowledge of the prior decisions of the Court in the Consolidated Cases and the Bankruptcy Courts in Vermont and Connecticut.

## COUNT I
### (Aiding and Abetting Trespass to Land)

### (Frumento)

112.    Plaintiffs repeat Paragraphs 1 through 111.

113.    By reason of the transactions described above, including in particular, the acts described in paragraphs 84 through 111, Cynthia Licata, SWJ, Mournes, Podell, James Licata, Blake, Shepro, East Coast Investments and Elliot Buchman have attempted to exercise control over substantial real estate owned by the Mocco Parties, without consent or authorization.

114.    By participating in the transactions described above, all of which he knew were a fraud on the Moccos and violations of orders entered in cases in which he had appeared as counsel, Defendant Frumento has caused, and continues to cause damages to the Moccos, to FCHG IV, and to various LLCs owned by the Moccos, including The Atrium at Hamilton Park Urban Renewal Associates LLC, Fulton's Landing Urban Renewal Associates LLC and Liberty Harbor Holding LLC.

115.    Defendant Frumento participated in the transactions described above with actual malice or a reckless indifference to the harm or damage he would cause, or with an actual intention to cause damage to the Moccos.  Defendant Frumento knowingly and willfully aided and abetted the principal conspirators in their unlawful and fraudulent scheme.

116.    In committing these acts, Frumento violated the September 21, 2001 Order entered in the consolidated cases.

WHEREFORE, Plaintiffs pray judgment against Defendant Frumento as follows:

a.      For compensatory damages;

b.      For interest and costs of the action, including reasonable counsel fees;

c.       An injunction against any further interference with the Moccos' ownership and enjoyment of their property;

d.       For punitive damages;

e.       For such other and further relief as the Court deems just and equitable.

## COUNT II

### (Conspiracy to Slander Title)

**(Frumento)**

117.     Plaintiffs repeat and reallege paragraphs 1 through 116.

118.     On or about March 13, 2006, the sale to SWJ finally closed, but SWJ has not paid the full consideration. On December 15, 2006, SWJ defaulted on its obligation to the Bankruptcy estate, $5.85 mil. plus interest. On December 15th, SWJ also defaulted on its obligation to pay an entity called Dare Investments $12.0 mil. in return for the $5 mil. that Dare had advanced as funding for the March 13, 2006 closing.

119.     In 2007, the bankruptcy trustees for Licata and FCCG obtained a judgment against SWJ which then also became the subject of a bankruptcy proceeding. The Licata and FCCG trustees along with Dare Investments held a security interest in all the assets conveyed by the Licata/FCCG estates to SWJ. These liens were given to secure the unpaid portion of the purchase price due to the trustee and the $5 mil. loan from Dare to SWJ which funded SWJ's initial payment. The trustees and Dare obtained relief from the bankruptcy stay in the SWJ case and foreclosed their liens on SWJ's assets through an auction held in the Bankruptcy Court in Bridgeport, Connecticut, on April 1, 2008. Their foreclosure and auction excluded only one asset of SWJ, the claimed interest in the real estate of FCHG IV.

120.    Notwithstanding the September 21, 2001 Order of the Court in the Consolidated Cases, the rulings of the Vermont Bankruptcy Court (determining that the Holding Entities belonged to the Moccos and that the Licatas were mere nominees), the November 16, 2005 Order of the Bankruptcy Court and the intended meaning of the Bankruptcy Court's orders as communicated by the Bankruptcy Court's rulings from the bench of which he was aware, Defendant Frumento, acting in concert with others, flagrantly, repeatedly and arrogantly recorded deeds or assisted and advised others in the recording of deeds and attempted to sell properties in which they had no right, title or interest.

121.    All of the foregoing actions undertaken by Defendant Frumento in the transactions described above led to the filing of deeds and other documents that affected title to Mocco properties, which, were false and slandered the true title held by the Mocco Parties.

122.    The deeds and other documents were filed for the purpose and with the intent of injuring the interests of the Mocco Parties.

123.    All of the foregoing actions undertaken by Defendant Frumento in the transactions described above were with knowledge of the falsity of the asserted ownership interest of the maker of the deed, and with the purpose to disparage and injure the Mocco Parties' title and ownership rights respecting Liberty Harbor, the Atrium, Fulton's Landing, FCHG IV and other Mocco properties, including their home.

124.    The actions undertaken by Defendant Frumento in the transactions described above pertaining to the outlined false representations were of a kind calculated to prevent others from dealing with the Moccos by creating an unwarranted cloud on title.

125.    The Moccos suffered actual pecuniary loss as a result of these slanders of title and other false representations made to prospective lenders from whom the Moccos sought to

borrow; to agencies and departments of the City of Jersey City; and to prospective lenders and investors who have or have attempted to record liens or effect transfers of real property owned by the Moccos.

126.    As a result of these slanders of title, the Mocco Parties have been unable to refinance the real estate owned by FCHG IV even though the first mortgage came due in June of 2007. Since that due date, the Moccos have been required to pay penalty rate interest at a monthly additional cost of approximately $18,000 plus they are incurring an accrued special services fee on this securitized loan, which fee is now believed to exceed $500,000. Finally, the Mocco Parties have incurred and continue to incur very substantial counsel fees and other costs in their efforts to clear title to the FCHG IV properties.

WHEREFORE, the Mocco Parties demand relief against Defendant Frumento as follows:

a.      For compensatory damages;

b.      For punitive damages;

c.      For such other and further relief as the Court deems just and equitable including interest, counsel fees, and costs.

## COUNT III

### (Conspiracy to Perpetrate "The Wild Deed Scam")

### (Frumento)

127.    Plaintiffs repeat and reallege paragraphs 1 through 126.

128.    By one or more affirmative acts or intentional failures to act or report, Defendant Frumento participated in and furthered The Wild Deed Scam in which:

a.      Facts were fraudulently misrepresented concerning the ownership of real estate in dispute in this case and the Consolidated Cases;

b.    Orders of the Court in the Consolidated Cases and Orders of the Bankruptcy Court were violated and misrepresented;

c.    His activities, and the activities of others, were carefully concealed from the Court in the Consolidated Cases and the real owners of the property; and

d.    The Mocco properties were used to secure loans that far exceeded their value with the net proceeds of those loans being distributed to, among others, Mr. Frumento and his client.

129.    Defendant Frumento's participation in the communications and negotiations that culminated in the sale of FCHG IV's real estate included false representations as to who owned FCHG IV and resulted in that real estate being buried in liens to secure loans to non-owners.

130.    Defendant Frumento's participation in the making and recording of such wild deeds was intended to induce the reliance of banks, lenders, and others on false representations.

131.    The participation of Defendant Frumento was necessary and instrumental to perpetrating the fraud.

132.    Nevertheless, the making and recording of the wild deeds and mortgages on the FCHG IV real estate and other Mocco properties caused, and causes, the Moccos damages by forcing them to incur time, effort and expense to undo the deeds, and to communicate with persons who might otherwise be misled.  The wild deeds further damage the Moccos by interfering with and in some cases preventing refinancing of their properties and by interfering with continued development of Liberty Harbor.

WHEREFORE, the Mocco Parties demand judgment:

a.    For compensatory damages;

b.    For punitive damages;

c. For such other and further relief as the Court deems just and equitable including interest, counsel fees, and costs.

## COUNT IV

### (Aiding a Civil Conspiracy through Negligent Supervision)

### (Chicago Title)

133. Plaintiffs repeat Paragraphs 1 through 132.

134. As part of the agency relationship between Chicago Title and Horizon Title, Chicago Title had a duty to oversee the acts of its agent Horizon.

135. During their agency relationship, Chicago Title adopted rules and procedures for the oversight and supervision of its agent Horizon and its employees.

136. Chicago Title, through its agent Horizon, performed extensive title and bankruptcy searches (billing in excess of $200,000 for these services) and issued multiple insurance policies relating to the properties and/or mortgages outlined above, each in excess of $1 mil.

137. Through Horizon, Chicago Title issued a $15 mil. policy relating to the Centrum mortgage as outlined above.

138. Through Horizon, Chicago Title issued a policy of approximately $22 mil. relating to the second mortgage of Cynthia Licata as outlined above.

139. Through Horizon, Chicago Title issued a $2 mil. policy relating to the $2 mil. mortgage acquired by Advertising Management and Consulting Services, Inc., Sky Land Investments and Gregory Crane from SWJ as outlined above.

140. In another related transaction, Horizon issued a $5 mil. policy to Dare Investments.

41

141. The insurance policies issued by Chicago Title became part of a series of fraudulent misrepresentations and non-disclosures of material information concerning the ownership of FCHG IV, which resulted in the recording of unauthorized liens upon the real property of FCHG IV.

142. Because Chicago Title failed to enforce its own rules and procedures, its "rogue agents" Horizon and Cohn were able to issue over $40 mil. of Lender title insurance which insurance was essential to consummation of the frauds that were committed against the Moccos and others.

143. Had it honored and performed its duty to supervise its agent, Chicago Title would have known about Horizon's tortious conduct and the wild deed scam would not have succeeded.

144. Chicago Title breached its duty to supervise its agent Horizon by failing to enforce its own rules applicable to policies such as the ones issued here, each of which exceeded the limits of Horizon's authority and failed to prevent Horizon's tortious conduct.

145. As a result of Chicago Title's negligent supervision, the Moccos suffered and continue to suffer harm.

WHEREFORE, the Mocco Parties demand judgment:

a. Recovering compensatory damages;

b. Recovering punitive damages;

c. For such other and further relief as the Court deems just and equitable including interest, counsel fees, and costs.

# COUNT XXI

## (Aiding a Civil Conspiracy and the Commission of a Tort)

### (Chicago Title)

146.  Plaintiffs repeat Paragraphs 1 through 145.

147.  Chicago Title, through its agents Horizon Title and Cohn, knew, or should have known, that the parties to the transactions they were insuring were concealing all their activities from the Moccos who had developed and managed all the FCHG IV properties for over 20 years. They also knew of the extensive history of litigation in both the state Courts and the Bankruptcy Court. These facts, plus the extraordinary terms of the transactions on their face put Chicago Title on notice of the fraud that was actually being committed.

148.  Chicago Title had a duty to, at the very least, make inquiries of the Moccos prior to aiding and abetting the fraudulent mortgages and attempted transfer of the FCHG IV real estate yet made no such inquiries.

149.  To the extent that Chicago Title's agents, Horizon and Cohn, were acting within the scope of their authority, Chicago Title is responsible for their tortious acts. To the extent that Horizon and Cohn were "rogue agents" acting outside the scope of their authority or contrary to the instruction or directives of Chicago Title, Chicago Title is liable for the tortious conduct of Horizon and Cohn by reason of Chicago Title's virtually total failure of supervision of their agents.

150.  Moreover, Chicago Title's review and/or approval of the commitments for insurance issued by its agents Horizon and Cohn relating to the four policies outlined above serve as its ratification of the tortious acts of its agents Horizon and Cohn against the Moccos and were to the benefit of Chicago Title.

151.    As a result of Chicago Title's actions, the Moccos suffered and continue to suffer harm.

WHEREFORE, the Mocco Parties demand judgment:

a.    Recovering compensatory damages;

b.    Recovering punitive damages;

c.    For such other and further relief as the Court deems just and equitable including interest, counsel fees, and costs.


## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, James A. Scarpone is hereby designated as trial counsel for the plaintiffs.


## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable in this matter.


## CERTIFICATION

The matter in controversy is not the subject of any other action or arbitration proceeding now or contemplated, and that to the best of my present belief no other parties should be joined in this action pursuant to R. 4:5-1, except those cases listed as part of the Consolidated Cases under Docket No. ESX-280-98 and Read Properties Group v. First Connecticut Holding Group,

Docket No. ESX-C-407-01, which involves many of the same parties and properties involved in this transaction.

SCARPONE & VARGO LLC

By: _____
JAMES A. SCARPONE, ESQ.
BRUCE D. VARGO, ESQ.
50 Park Place, Suite 1003
Newark, New Jersey 07102
(973) 623-4101
*Attorneys for Peter Mocco and Lorraine Mocco and The Mocco Parties*

Dated: January 23, 2012

ESSEX COUNTY - CIVIL DIVISION
SUPERIOR COURT OF NJ
465 MARTIN LUTHER KING JR BLVD
NEWARK        NJ 07102

COURT TELEPHONE NO. (973) 693-5529
COURT HOURS

DATE:    FEBRUARY 01, 2012
RE:      MOCCO VS FRUMENTO
DOCKET:  ESX L -000641 12

THE ABOVE CASE HAS BEEN ASSIGNED TO: TRACK 2.

DISCOVERY IS  300 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

THE PRETRIAL JUDGE ASSIGNED IS: HON SEBASTIAN P. LOMBARDI

IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      002
AT: (973) 693-6443 EXT 6431.

IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH R.4:5A-2.

ATTENTION:

SCARPONE & VARGO LLC
SUITE 1003
50 PARK PLACE
NEWARK        NJ 07102-4300

JUGHOL0