# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PETER MOCCO, LORRAINE MOCCO AND FIRST CONNECTICUT HOLDING GROUP LLC, IV, | CASE NO.:  12-cv-1458-ES-JAD |
| Plaintiffs, | Civil Action |
| v. | Hon. Esther M. Salas, U.S.D.J. |
| | Hon. Joseph A. Dickson, U.S.M.J. |
| AEGIS FRUMENTO AND CHICAGO TITLE INSURANCE COMPANY, | |
| Defendants. | |

## PLAINTIFFS' OBJECTIONS TO
## REPORT AND RECOMMENDATION DATED APRIL 14, 2016

**SCARPONE & VARGO LLC**
50 Park Place, Suite 1003
Newark, New Jersey 07102
(973) 623-4101
(973) 623-4181 (fax)
Attorneys for Plaintiffs

Of counsel and on the brief:
    James A. Scarpone, Esq.
    Bruce D. Vargo, Esq.

## **TABLE OF CONTENTS**

Introduction .................................................................................................. 1

POINT I:  Timing and the Current Status of the State Court Case ........................ 5

POINT II:  The Magistrate Judge Erroneously Concludes That CT Was
Excluded From the Ownership Trial ................................................................ 10

POINT III:  The Magistrate Judge Erroneously Interposes a Dictionary
Definition of "Successive Action" for the Definition Employed by the New
 Jersey Courts ............................................................................................. 14

POINT IV:  The Magistrate Judge Erroneously Equates a One Year Delay With
"Inexcusable Failure to Comply" With the Rule Notwithstanding the
Defendants' Failure to Submit Evidence to Support a Finding of
"Inexcusability" and the Presence of Evidence of Obstruction by CT ............... 18

POINT V:  The Magistrate Judge's Finding of "Substantial Prejudice" is Based
on Misunderstandings of Both the Facts of This Case and the Applicable
New Jersey Statute of Limitations ................................................................. 23
        A. The Passage of Time/Dulled Memories Argument ............................. 23
        B. The Denied Participation in State Court Trial Argument .................... 24
        C. There Are No Time-Barred Claims ................................................. 26
        D. The False Claim of Lost Evidence ................................................. 28

Conclusion .................................................................................................. 31

# TABLE OF AUTHORITIES

## CASES

*700 Highway 33 LLC v. Pollio*, 421 *N.J. Super.* 231
(App. Div. 2011) ................................................................. 15, 16, 23, 24

*Allstate N.J. Ins. Co. v. Cherry Hill Pain & Rehab. Inst.*,
389 *N.J. Super.* 130 (App. Div. 2006), *certif. denied*, 190 *N.J.* 254 (2007) ......... 16

*Alpha Beauty Distributors, Inc. v. Winn-Dixie Stores, Inc.*, 425 *N.J. Super.* 94
(App. Div. 2012) ................................................................. 15, 16, 17, 18

*Ctr. for Prof'l Advancement v. Mazzie*, 347 *F. Supp. 2d* 150
(D.N.J., Dec. 9, 2004) ............................................................. 17, 18, 23

*Hillsborough Tp. Bd. of Educ. v. Faridy Thorne Frayta, P.C.*,
321 *N.J. Super.* 275 (App. Div. 1999) ................................................ 30

*Hobart Bros. Co. v. Nat. Union Fire Ins. Co.*, 354 *N.J. Super.* 229
(App. Div. 2002) ..................................................................... 17, 18

*Mettinger v. Globe Slicing Mach. Co.*, 153 *N.J.* 371 (1998) .................................. 26

*Mitchell v. Charles P. Procini, D.D.S.*, 331 *N.J. Super.* 445
(App. Div. 2000) ...................................................................... 23, 29

## RULES

*Rule* 4:5-1(b)(2) ......................................................................... 15, 16, 17

# INTRODUCTION

In his Report and Recommendation ("R&R"), the Magistrate Judge misconceives both the facts and the law.  The most fundamental of the Magistrate Judge's factual misconceptions is his implicit conclusion that somehow the Mocco Parties derived a tactical advantage from not naming Aegis Frumento and Chicago Title ("CT") as defendants in Mocco's Second Amended Complaint filed in the state court.  In reaching this conclusion the Magistrate Judge overlooks the following facts:

a.      As the caption and the text of the Second Amended Complaint show (*see* Certification of John B. Nance in Support of Plaintiffs' Objections to the Magistrate's Report & Recommendation ("Nance Cert. 2"), <u>Exhibit L</u>)[1], prior to moving to add Frumento as a party we had already named multiple lawyer defendants including Dale Schreiber (a partner at Proskauer Rose, who settled with Mocco), Daniel Shepro (a Connecticut lawyer), Gordon Duval (a Utah lawyer), Armando Molina (a New Jersey lawyer) and Herbert Blake (a disbarred Connecticut lawyer who was working with the

---

[1]      The exhibits referenced herein are attached to the Certification of John B. Nance that accompanies the within Objection (referred to herein as "Nance Cert. 2") or were previously submitted to the Court as exhibits to the certifications that accompanied Mocco's opposition to the Defendants' motions to dismiss, including:  (i) Certification of John B. Nance In Opposition to Chicago Title's Motion to Dismiss (ECF No. 63) (referred to herein as "Nance Cert. 1") and (ii) Certification of Bruce Vargo in Opposition to Aegis Frumento's Motion to Dismiss (ECF No. 64) (referred to herein as "Vargo Cert.").

Licatas).[2]  Unlike Frumento, the involvement of these lawyer defendants was readily discernable in publicly available documents (deeds, mortgages, documents filed in the Bankruptcy Court).  Frumento's role in the transactions only became known to us when in discovery we received countless email buried in document productions that ran into hundreds of thousands of pages.  The point is that there is no demonstrable advantage for Mocco to withhold a claim against Frumento while suing four other law firms.  Under principles of issue preclusion and collateral estoppel, if Mocco loses on the claims against the other attorneys, the fact findings and conclusions of law underlying that loss may be used against him.  If Mocco prevails, the win cannot be used against Frumento.  In short, it was Frumento, not the Moccos, who was advantaged by not being joined in the prior case.

    b.    Likewise, there is no factual basis for the conclusion that the Moccos withheld their claim against CT for some tactical advantage.  As will be set forth in detail below, CT was very much a part of the state court trial.  CT's involvement in the state court case was and is that of an insurer who paid a claim and became subrogated to its insured's rights.  (*See* Nance

---

[2]    Apparently overlooked by the Magistrate Judge is the fact that CT, calling itself "the Lenders," has asserted cross-claims and third-party claims in the state court case against these same attorneys and their firms.  (*See* Nance Cert. 2, <u>Exhibits E and F</u>).

Cert. 2, Exhibit H).  In that capacity, CT tried and lost a quiet title action

resulting in the invalidation of $15 mil in liens that they took by subrogation

from their insured, Centrum.  CT also, in that same trial, received a $1.8 mil

so-called "equitable lien" against the real property of an entity (FCHG IV)

which the Court found was owned by Lorraine Mocco.  (*See* Nance Cert. 2,

Exhibit A).  The lien was granted to CT not to Centrum whose chief

executive testified at trial that Centrum had no financial interest in the case.

(*See* Nance Cert. 2, Exhibit D).  In fact, as these Objections are being

submitted to this Court, CT has pending before the state court a series of

motions for summary judgment on over $50 mil in claims which the

Magistrate Judge erroneously determined were lost to CT because Mocco

did not make it a party to the state court case.  (*See* Nance Cert. 2, Exhibits E

and F).  Finally, in at least two points of his opinion, Judge Rothschild

concludes that CT was the real party in interest in the trial before him.  (*See*

Nance Cert. 2, Exhibit N).  In none of this can one reasonably find an

advantage to the Moccos or prejudice to CT.  It is CT who is trying to get

two bites at this apple.

      c.     Notwithstanding the fact that it was not a named party to the

state case, CT seized possession of all the records of Horizon Title, its agent,

which records were central to the Mocco claims.  From that position CT was

3

able to assert a seemingly endless string of objections and privileges to

Mocco discovery requests.  The results were rulings by the state court

appointed Discovery Master (Chief Justice (Ret.) James R. Zazzali)

including the following:

> While I have concluded that I do not have
> jurisdiction to impose sanctions on Chicago
> Title, I note this is not the first instance in
> which I have been presented with evidence
> suggesting that Chicago Title has, at the very
> least, attempted to exert influence over parties
> to this litigation regarding the scope of their
> discovery responses.  *See* my prior rulings
> dated April 13, 2010, April 14, 2010 and June
> 2, 2010.  Although it is for the trial court to
> adjudicate the propriety of Chicago Title's
> alleged actions, I advise all parties to this
> litigation to be mindful of their own
> independent discovery obligations, as well as
> the guidelines set forth in this decision and my
> three prior rulings referred to above, when
> evaluating the completeness of their discovery
> responses in this litigation.

[*See* Nance Cert. 1, Exhibit P at 5.]

As can be seen from the above quote and other exhibits attached to the

certification that accompanied our opposition to CT's motion to dismiss (*see*

Nance Cert. 1, Exhibits I-N), CT was deeply involved in the discovery process as

well as the initial trial before the state court.

4

The point here, our first point, is simply that the only "advantage" gained from the existence of two separate law suits was gained by CT and Frumento. No one has pointed to any advantage realized by Mocco. We emphasize this preliminary point because we believe that the Magistrate Judge was unduly influenced by the overblown rhetoric and misstated facts thrown at him by CT and Frumento. In the remainder of this submission we will address in detail the major misstatements of the relevant facts. We will also address what we believe are fundamental misapplications of the New Jersey Entire Controversy Doctrine ("ECD") and erroneous understandings of the applicable New Jersey statutes of limitations.

## POINT I

### TIMING AND THE CURRENT STATUS
### OF THE STATE COURT CASE

It is both ironic and worthy of comment that the motion out of which the Magistrate Judge's Report and Recommendation stems, was referred to the Magistrate Judge by this Court in March 2015 (*see* ECF No. 84) and not decided until April 14, 2016. In his R&R, the Magistrate Judge takes us to task for taking a very similar period of time to review and analyze a series of document productions totaling in the hundreds of thousands of pages[3] and then prepare and file a proposed Amended Complaint. (R&R at 15). We do not make this point to

---

[3]    Of course, we have never counted them. That would only cause further delay.

criticize the Magistrate Judge. We merely want to point out that like the Magistrate Judge or this Court, but unlike our adversaries here and in the State Court, we do not have hundreds of associates to throw into the case at any given point. A finding that conduct was "inexcusable," we submit, should only be made with complete record not a mere assumption that one year is too long.

In August 2011, when Judge Vichness denied the Mocco motion for leave to amend the state court Complaint to add CT and Frumento as parties, no trial date was actually set but one was expected before the end of that year. In fact, no such date was set before Judge Vichness reached his mandatory retirement date. After several months when no judge was assigned to the case it was finally assigned to the Hon. James S. Rothschild, J.S.C.

The first of the three anticipated trials didn't start until November 2014, more than three years after the denial of our motion for leave to amend. That first trial, which we consistently refer to as the "ownership trial," was supposed to resolve two principal issues, namely, who owned certain entities and whether the $15 mil mortgage now held by CT and the $23 mil mortgage given to Cynthia Licata, both of which were recorded against the real estate owned by the entity known as FCHG IV, were valid and enforceable.

The parties to the ownership trial were to be the Moccos, the Bankruptcy Trustees for Licata and FCCG, Cynthia Licata, East Coast Investments LLC

6

("ECI")[4], the Proskauer law firm and Dale Schreiber[5], and CT who insisted on being called "the Lenders." Prior to trial the Moccos settled with Proskauer and the Trustees. ECI failed to retain counsel after the Podvey Meanor firm withdrew in 2009 and did not appear at trial. Cynthia Licata had counsel jointly with James Licata. That counsel appeared intermittently at trial, but Mrs. Licata herself never appeared even though both the Mocco Parties and CT had served Notices in Lieu of Subpoena requiring her testimony. Ultimately, the State Court found her and ECI to be in default and entered judgments against them. (*See* Nance Cert. 2, Exhibit B).

After the settlements (and the defaults of Cynthia Licata and ECI), what was properly left for trial was only the validity of CT's $15 mil mortgage on the FCHG IV real estate. Despite overwhelming evidence that Centrum and Horizon (CT's agent) had actual notice of Mocco's ownership claims and prior court orders and rulings and much more, the trial court permitted CT to retry issues decided in prior litigation between Mocco and Licata.

---

[4]      ECI is a Florida LLC whose members are James and Cynthia Licata and members of a Florida law firm that was James Licata's defense counsel in a criminal prosecution brought against him by the U.S. Attorney in Connecticut. ECI claimed to be the assignee of the $23 mil second mortgage Cynthia Licata took at the May 2006 closing.

[5]      Proskauer and Schreiber did not assert any claim of ownership. However, because of the potential impact on the claims against them they were permitted to fully participate in the ownership trial. Other defendants, including several lawyers, against whom Mocco had asserted damage claims chose not to participate in the ownership trial.

Eventually, by its June 5, 2015 Judgment and accompanying opinion, the state court reached the same conclusion as to ownership of FCHG IV as had the U.S. Bankruptcy Court and District Court for the District of Vermont in 2004 and 2006. (*See* Vargo Cert., Exhibits G and H). In 2007 they were affirmed by the Court of Appeals for the Second Circuit. (*See* Vargo Cert., Exhibit I). These three opinions dealt with the same legal and factual disputes between the same parties (the Moccos and the Licatas) albeit as to different LLCs which owned different properties.[6] The LLC whose ownership was in dispute in the state court trial was formed at the same time, by the same people, for the same purpose and using the same forms as the five LLCs whose ownership was contested in Vermont. Nonetheless, CT insisted upon and was permitted to retry the same arguments rejected by five federal judges, even though CT's agent, Horizon, had notice of the first two opinions well before the loan was made and the title insurance issued.

On July 15, 2015, the Mocco Parties filed a Notice of Appeal from Judge Rothschild's June 5, 2015 judgment. The Mocco appeal seeks reversal of that portion of the judgment which grants CT a so-called "equitable lien" in the amount of $1.776 mil. CT, again calling itself "the Lenders," has cross-appealed from that portion of the judgment which determines that Mocco owns FCHG IV (and through it the real estate) and that the $15 mil in mortgages now held by CT are

---

[6]      The title which CT insured derived from Cynthia and James Licata.

8

unenforceable and should be stricken from the land records of Hudson County. Other parties, the Licatas and Herbert Blake, have also cross-appealed, but their positions are not readily decipherable and, we submit, not helpful to the present issue. The briefing schedule, as currently in place, extends through early July, and requests are pending that will take it into August. Based on recent experience in the Appellate Division of the Superior Court, we do not believe that it is reasonable to expect a decision before late 2017 and it could be later than that.

After, and to some extent depending on how the appeal is decided, there still remains before the state court two additional trials. This, of course, assumes that the Appellate Division decision does not mandate a retrial of the ownership trial. The next trial to be scheduled is what has been called the "Titan or EMP Trial." This trial involves disputes between the Mocco Parties and a family of businesses lumped together under the name "Titan Group." Those disputes are not materially related or connected to the present case.

The third trial is called the "Damages Trial." This trial, a jury trial, includes the damage claims asserted by Mocco AND THE DAMAGE CLAIMS ASSERTED BY CT. Of course, we expect that CT will tell us that these claims (the same claims asserted in its pending summary judgment motions, *see* Nance Cert. 2, Exhibits E and F), are being asserted by the "Lenders" and not by it. However, we know from experience and the pending summary judgment motions,

9

that any judgment will be issued in the name of CT, not any bank or Centrum. Any financial recovery will go to CT.

Neither of the two additional trials, and certainly not any retrial, can start before the appeal before the Appellate Division is decided. Also, we have another potential source of delay in that Judge Rothschild recently reached the mandatory retirement age, and we now have an entirely new judge. Absent a settlement, which we don't think is possible while the appeal remains undecided, there is still additional discovery relating to both the Titan and the Damages trials. In sum, we think there is no reasonable likelihood that the state court damages trial will begin before the second half of 2018. We are here simply estimating in the roughest possible way. The real point is that the Magistrate Judge's recommended order assumes a swiftness of resolution in the state case which assumption has no basis in the reality that has plagued this case.

## POINT II

### THE MAGISTRATE JUDGE ERRONEOUSLY CONCLUDES THAT CT WAS EXCLUDED FROM THE OWNERSHIP TRIAL

In his Report and Recommendation, the Magistrate Judge makes much of what he concludes was the defendants' "Inability to Participate in the State Court Matters." (R&R at 17-19). We will address this misunderstanding of what actually happened in the state court separately as to CT and Frumento.

10

The complaint on which the ownership issue went to trial lists Centrum and three west coast banks that financed Centrum as named defendants in their capacity as the holders of three co-equal $5 mil "first mortgages" which, for convenience, all parties simply refer to as the $15 mil Centrum mortgage. CT, through its agent, Horizon, had issued lender title insurance on these mortgages. Initially, CT retained Herrick Feinstein to represent Centrum and the three banks, but when a coverage dispute arose between Centrum and CT, Herrick was replaced as counsel to Centrum. (*See* Nance Cert. 2, Exhibit I). (It is believed that prior to October 2009, CT had already settled the claims of the three banks.) In October 2010, Lynda Bennett, Esq. was substituted as counsel for Centrum. (*See* Nance Cert. 2, Exhibit J). Finally, after resolution of the coverage dispute between Centrum and CT, Herrick was substituted back into the case as counsel for Centrum. (*See* Nance Cert. 2, Exhibit K).

In February 2014, Herrick moved for the appointment of a rent receiver and an accounting for the FCHG IV portfolio of rental housing in Jersey City and North Bergen. In a footnote to the brief that Herrick submitted in support of the motion, counsel wrote:

> If, however, the Court were to conclude that a formal amendment of the pleadings is necessary, the Court can and should direct that the caption be amended to substitute Chicago Title in favor of the Lenders insofar as Chicago Title is the successor-in-interest to the Lenders

11

with respect to the Mortgages and other Loan
Documents.

[*See* Nance Cert. 2, Exhibit H at 2, n.5].

The Court chose not to require the formal amendment.

At trial, the defense was presented by three lawyers – Paul Schafhauser, Esq.

of Herrick Feinstein, Joseph Tucker, Esq. and Richard McLaren, Esq.  Messrs.

Tucker and McLaren, both of whom fully participated in the trial including

examining witnesses and arguing motions and objections, are employees of a

corporate entity known as the Fidelity National Law Group.  (*See* Nance Cert. 1,

Exhibit N; Nance Cert. 2, Exhibit D at 1).  Fidelity Law is owned and controlled by

Fidelity National Financial, Inc., CT's parent company.

On the very first day of trial, Bruce Berreth, an attorney from Seattle,

Washington who was also the President and Chief Operating Officer of Centrum,

testified that neither Centrum nor the three banks had any financial interest in the

outcome of the case.  (*See* Nance Cert. 2, Exhibit D).  That, of course, leaves only

CT as a party with a financial interest and represented by two lawyers employed by

CT's parent corporation and one New Jersey counsel paid by CT.

When, on June 15, 2015, the state court entered its "Order and Judgment,"

paragraph 4 provided:

An equitable lien shall be and hereby is imposed in favor
of Chicago Title, as subrogee of the Lenders, with respect

12

to the property owned by FVHG IV in the amount of
$1,776,118.53.

[*See* Nance Cert. 2, Exhibit A at 3 (emphasis added)].

Later, after the Moccos appealed and moved for a stay of enforcement of the Order

and Judgment quoted above, the state court entered another order. (*See* Nance

Cert. 2, Exhibit C). This order directs the manner of payment "to Chicago Title"

and the obligation of Chicago Title to return the money within twenty days if there

is a reversal on appeal.

Most recently, by motions filed on March 4, 2016 and still pending before

the Hon. Stephanie Mitterhoff, J.S.C., who has replaced Judge Rothschild, Chicago

Title has moved for summary judgment against three lawyers, two law firms and

one guarantor of the notes they hold. (*See* Nance Cert. 2, Exhibits E and F). These

motions for summary judgment assert the claims as to which the Magistrate Judge

opined that:

> [t]he applicable limitations periods for Defendants'
> potential affirmative contract and tort claims regarding
> the events in question, which occurred in 2005 and 2006,
> have long since run.

[R&R at 20].

As support for this incorrect conclusion, the R&R cites only the Reply Briefs (to

which we got no response) submitted by Frumento and CT on the motions to

dismiss. *Ibid.* The claims reflected here have been part of the state court case for

13

nine years.  They were asserted by Herrick on behalf of "the Lenders" in whose

shoes CT has been standing since at least as far back as October 2011, when

Herrick Feinstein was substituted back in as counsel for Centrum following

settlement of the coverage litigation between Centrum and CT.  (*See* Nance Cert.

2, Exhibit K).  All the claims that CT has or ever had in this or the state court

matter are claims acquired by CT through subrogation when it settled the insurance

claims asserted by "the Lenders."  (*See* Nance Cert. 2, Exhibit H at 5, n.2).

Frumento has no claims other than possible contribution or indemnity claims

which, as the Magistrate Judge found, are not time-barred at all.[7]  (R&R at 19-20).

In other words, contrary to the totally inaccurate factual assertions foisted on the

Magistrate Judge by CT and Frumento, there are no claims that have been lost by

either defendant.

## POINT III

### THE MAGISTRATE JUDGE ERRONEOUSLY INTERPOSES A DICTIONARY DEFINITION OF "SUCCESSIVE ACTION" FOR THE DEFINITION EMPLOYED BY THE NEW JERSEY COURTS

In the concluding section of his Report and Recommendation (R&R at 22-

26), the Magistrate Judge indulges in two very clear errors on the question of

whether this case is a "successive action" within the meaning of the New Jersey

ECD.  In concluding that it is, the Magistrate Judge overlooks controlling New

---

[7]    We must at this time point out the disingenuousness of CT asserting substantial prejudice based on the loss of claims while they are moving for a $54 mil summary judgment on those same claims which they have been prosecuting for nine years.

Jersey appellate case law as to what constitutes a "successive action" and, instead, relies upon a dictionary definition.  The Magistrate Judge also engages in a very dubious form of analysis by which he concludes that even if this case is not a successive action now, it will "become" a successive action "upon the conclusion of the state court matters."  (R&R at 22).  This recommendation essentially says that this Court has the discretion to get rid of this case by making it a successive action through the simple mechanism of a stay, *i.e.*, by refusing to decide it.

The most recent explication by the appellate courts of New Jersey of just what constitutes a "successive action" is found in *Alpha Beauty Distributors, Inc. v. Winn-Dixie Stores, Inc.*, 425 *N.J. Super*. 94, 101 (App. Div. 2012), a case cited by us to the Magistrate Judge but not addressed in the R&R.  *Alpha Beauty* tells us that:

> By "successive action," the Rule clearly meant to encompass only actions *following* suit in which the *Rule* 4:5-1(b)(2) violation occurred.  The most obvious example of this would be an action where A sues B for personal injury damages, and then, later, <u>after A v. B. is concluded, A brings a claim against C for having caused the same injuries</u>.  A v. C would be a "successive action" within the intendment of the Rule.

> [425 *N.J. Super*. at 101 (emphasis added)].

*See also 700 Highway 33 LLC v. Pollio*, 421 *N.J. Super*. 231, 238 (App. Div. 2011) ("The entire controversy doctrine bars a subsequent action <u>only when a prior action</u> based on the same transactional facts <u>has been tried to judgment or settled</u>."

(emphasis added)) (quoting *Allstate N.J. Ins. Co. v. Cherry Hill Pain & Rehab. Inst.*, 389 *N.J. Super.* 130, 140 (App. Div. 2006), *certif. denied*, 190 *N.J.* 254 (2007).

These definitions offered by the Appellate Division in *Alpha Beauty* and *700 Highway* make it clear that a second case is a "successive action" for purposes of *Rule* 4:5-1(b)(2) only if it is *filed after the first case is "tried to judgment or settled."* No New Jersey case supports the proposition that the second court can turn the second case into a "successive action" by simply staying it until the first case is over, as the Magistrate Judge has suggested here.

Factually, *Alpha Beauty* is also instructive. The plaintiff, a shareholder in Alpha, had sued two of his fellow shareholders alleging breaches of fiduciary duties in connection with the defendants' dealings with certain customers. This first case was filed in federal court and was pending with discovery complete and a final pre-trial order entered when Alpha filed a second case in state court against two customers referenced but not joined in the first case. *Id.* at 109. In its *Rule* 4:5-1(b)(2) disclosure, Alpha failed to disclose the federal case. The trial judge in the state court matter, finding a violation of *Rule* 4:5-1(b)(2) and invoking the ECD, dismissed the second case. The Appellate Division reversed, finding that the second case was not "successive" but "pending" and that there was no violation of

16

the rule.  The Appellate Court also found that the asserted violation of the ECD

"did not warrant" dismissal of the second action.  *Id.* at 101, 109.

Another important aspect of the Appellate Division's decision in *Alpha*

*Beauty*—and a point that the Magistrate Judge appears to have overlooked here—

pertains to the burden of proof.  The Appellate Division explains that:

> [a]s the opponent of a motion to dismiss, Alpha was
> entitled to have the trial judge assume that Alpha was in
> no position to assert a claim against C & S and United at
> the time the federal complaint was filed.

> [*Id.* at 107.]

In short, under New Jersey law, the party moving for relief pursuant to the ECD

has the burden of showing <u>by a preponderance of the evidence</u> that any violation of

*Rule* 4:5-1(b)(2) was "inexcusable" and that each of the moving parties have

suffered "substantial prejudice."  *Hobart Bros. Co. v. Nat. Union Fire Ins. Co.*, 354

*N.J. Super.* 229, 242 (App. Div. 2002); *Ctr. for Prof'l Advancement v. Mazzie*, 347

*F. Supp. 2d* 150, 157 (D.N.J., Dec. 9, 2004) ("In all instances, the party seeking

application of the entire controversy doctrine bears the burden of demonstrating

inexcusable conduct and substantial prejudice[.]")  Here, the Magistrate Judge's

recommended findings that there was a violation of the Rule and that the violation

was "inexcusable" are based on nothing more than the rhetoric of counsel and

certainly not on any reasoned analysis of what was actually going on in the state

court during the relevant period.  *See* Point IV, *infra*.  The recommended finding of

17

"substantial prejudice" is also unsupported by evidence sufficient to meet the

movants' burden and, as shown below, is inconsistent with applicable New Jersey

law.

## POINT IV

### THE MAGISTRATE JUDGE ERRONEOUSLY EQUATES A ONE YEAR DELAY WITH "INEXCUSABLE FAILURE TO COMPLY" WITH THE RULE NOTWITHSTANDING THE DEFENDANTS' FAILURE TO SUBMIT EVIDENCE TO SUPPORT A FINDING OF "INEXCUSABILITY" AND THE PRESENCE OF EVIDENCE OF OBSTRUCTION BY CT

The Report and Recommendation erroneously approaches this issue as if

New Jersey law says that once a party is accused of an ECD violation, that party

has the burden of coming forward with a good excuse.  In fact, as noted above,

New Jersey law is quite the opposite.  Appellate decisions such as *Alpha Beauty*

and *Hobart Bros*. (as cited by Judge Ackerman in his opinion in *Mazzie*) make

clear that the burden is on the moving party to prove "inexcusability."  All that was

advanced by CT and Frumento were assertions that our motion for leave to amend

the state court complaint was filed approximately one year after they finally

produced documents and we had the opportunity to depose David Cohn, a key

witness.

Without an analysis of the surrounding facts, something neither CT,

Frumento, nor the Magistrate Judge even attempted, one cannot jump to the

conclusion that taking a year to complete the task is presumptively "inexcusable."

18

CT and Frumento never even attempted to meet their burden of showing that taking a year to examine the documents and draft the necessary amended pleadings was "inexcusable" under whatever circumstances prevailed at the time.

The Magistrate Judge's Report & Recommendation simply assumes that one year is much too long and never examines what was going on in the state court litigation during that year.  The year in question begins with the deposition of David Cohn in April 2010, continues through document productions throughout the Spring and Summer of 2010 and concludes in June 2011 when the Mocco motion for leave to amend was filed.  As examples of what was happening in the state court at that time, we submit the following brief sampling from the exhibits that we submitted with our opposition to the motions to dismiss.

In March 2010, in response to obstruction by CT, the Mocco Parties sought a ruling from the Discovery Master and an order compelling production.  (*See* Nance Cert 1, <u>Exhibit L</u>).  The Discovery Master received sixteen separate submissions on this motion, including *seven* from Michael O'Donnell, Esq., as counsel for CT.  (*Id.* at 1-2).  In his opinion, which was issued on June 2, 2010, Justice Zazzali ruled against CT on every significant point and ordered CT and its insureds to provide all of the information and documents that had been improperly withheld.  (*Id.* at 14-15).

19

In the same opinion, Justice Zazzali also addressed concerns raised by the Moccos regarding objections asserted by Derrick Freijomil, Esq. of the Riker Danzig firm at the April 2010 deposition of David Cohn, the Horizon Title agent principally responsible for issuing the title policies on all of the fraudulent mortgages. After reviewing the transcript of Mr. Cohn's deposition, Justice Zazzali found:

> Mr. Freijomil repeatedly suggested that the witness not answer questions on the grounds of confidentiality and, without exception, Mr. Pisarri [Horizon's counsel] then instructed the witness not to answer those questions. *See e.g.*, Transcript at pp. 66 through 100, 109. Mr. Cohn was instructed not to answer, and did not answer, questions regarding his personal knowledge of events that occurred while he was an employee of Horizon Title that clearly appear reasonably calculated to lead to the discovery of relevant evidence. Because those matters are not subject to any privilege or right to confidentiality, Mr. Freijomil should not have suggested that Mr. Cohn not answer those questions, and Mr. Pisarri should not have instructed the witness to comply with those suggestions.

[*Id.* at 13-14.]

Notwithstanding Justice Zazzali's June 2, 2010 opinion, Riker Danzig attorneys continued to obstruct discovery with the same tactics—directing the CT insureds to assert baseless privilege objections in response to the Moccos' interrogatories and document requests and coercing the insureds' cooperation with

20

their obstruction by threatening to withdraw or deny coverage pursuant to the duty to cooperate provisions of the parties' policies if the insureds did not go along with its strategy.  Frustrated with these tactics, Lynda Bennett, Esq., Centrum's counsel, wrote to Derrick Freijomil, Esq. on March 14, 2011:

> With respect to the Mocco Litigation Documents, no privilege log has been provided for documents withheld from production in the Mocco matter because, as you are well aware, Chicago and Centrum are currently engaged in a dispute over issues associated with these documents such that no documents have been produced yet. Centrum has a privilege log and production prepared for that litigation.  Chicago continues to insist that Centrum claim privilege over documents that are clearly not privileged.  Centrum repeatedly has invited Chicago to obtain resolution of the issue from the Special Discovery Master presiding over the State Court Litigation, i.e., Justice Zazzali.  Inexplicably, Chicago fails to do so and instead continually and improperly accuses Centrum of a "failure to cooperate" and threatens Armageddon if Centrum complies with its obligation to respond to pending discovery requests and Justice Zazzali's prior orders on this topic.  Chicago's position is indefensible.
>
> [*See* Nance Cert 1, Exhibit M at 3 (emphasis added); *see also* Nance Cert 1, Exhibit P at 3 (quoting March 22, 2011 follow-up letter from Lynda Bennett, Esq. to Derrick Freijomil, Esq.)]

On June 15, 2011, Justice Zazzali issued a ruling addressing these issues. Overruling CT's objections again, Justice Zazzali ordered Centrum to produce the

documents it had been withholding at CT's insistence within five days. (*See* Nance Cert., Exhibit P at 4). In the concluding paragraph of his June 15, 2011 opinion, Justice Zazzali added:

> While I have concluded that I do not have jurisdiction to impose sanctions on Chicago Title, I note this is not the first instance in which I have been presented with evidence suggesting that Chicago Title has, at the very least, attempted to exert influence over parties to this litigation regarding the scope of their discovery responses. *See* my prior rulings dated April 13, 2010, April 14, 2010 and June 2, 2010. Although it is for the trial court to adjudicate the propriety of Chicago Title's alleged actions, I advise all parties to this litigation to be mindful of their own independent discovery obligations, as well as the guidelines set forth in this decision and my three prior rulings referred to above, when evaluating the completeness of their discovery responses in this litigation.
>
> [*Id.* at 5.]

Faced with this kind of obstruction, is it really any wonder that it took a year? By submitting this partial analysis we do not mean to assume the burden of proof that properly belongs to CT and Frumento. We only wish to illustrate the kind of facts that the Magistrate Judge never saw because he erroneously accepted the naked conclusions advanced by CT and Frumento, namely, that one year is inexcusable.

## POINT V

## THE MAGISTRATE JUDGE'S FINDING OF "SUBSTANTIAL PREJUDICE" IS BASED ON MISUNDERSTANDINGS OF BOTH THE FACTS OF THIS CASE AND THE APPLICABLE NEW JERSEY STATUTE OF LIMITATIONS

The Magistrate Judge's finding of "substantial prejudice" is based on three erroneous findings – (1) the passage of time, "dulled memories" argument which has been rejected by New Jersey courts; (2) the asserted deprivation of an opportunity to participate in the "ownership trial" which in the case of CT is factually untrue and in the case of Frumento essentially irrelevant; (3) that certain unspecified claims that the defendants may have are now time-barred which is both untrue and unsupported by any evidence or specific showing by CT.

### A.   The Passage of Time/Dulled Memories Argument

New Jersey courts have consistently rejected this argument as a basis for a finding of "substantial prejudice" and have consistently required an adequate evidentiary record showing specific "prejudice" or loss flowing from specific lost testimony or documents.  "Delay alone does not serve to create substantial prejudice." *Mitchell v. Charles P. Procini, D.D.S.*, 331 *N.J. Super*. 445, 456 (App. Div. 2000).  "Rather, delay results in substantial prejudice only when coupled with unavailability of information caused by that delay." *Mazzie, supra*, 347 *F. Supp. 2d* at 156.  In *700 Highway* the court, confronted with a claim of faded memories reasoned as follows:

Moreover, by not being named in the 2003 action, Pollio and Cramar were spared the time and expense of five years of litigation.  The trial court must evaluate these considerations on an adequate factual record in determining whether the right of Pollio and Cramar to defend the present action has been substantially prejudiced by not having been identified in the 2003 action.

[*700 Highway*, 421 *N.J. Super.* at 237-8 (emphasis added).]

B.   The Denied Participation in State Court Trial Argument

As shown in Point I above, CT has been a full and active participant in the state court proceedings to the point that a judgment was entered granting an equitable lien in favor of CT in the amount of $1.776 mil, an amount which has since been paid.  (*See* Nance Cert. 2, Exhibit M).  This judgment was rendered at the conclusion of the Ownership Trial.  CT, again calling itself "the Lenders," has also filed cross-claims and third-party claims on which they are currently moving for summary judgment in an amount exceeding $50 mil.  (*See* Nance Cert. 2, Exhibits E and F).  As in the case of the equitable lien and the $1.1776 mil payment, any recovery on the cross-claims or third-party claims will go to CT not to any lender.  There is no rational basis for a conclusion that CT was precluded from an opportunity to participate in the Ownership Trial or in the Damages Trial which at this point cannot be expected to occur for at least two more years.

As to Frumento, it is true that he was not given an opportunity to participate in the Ownership Trial. However, the actual cause of that "missed opportunity" was Frumento's decision to remove this case from state to federal court. Had the case been left in state court where Mocco filed it in January 2012, there could have been a consolidation and he could have opted to participate in the Ownership Trial, as the Proskauer defendants did before they settled, even though neither the Proskauer parties nor Frumento have even asserted any ownership or lien claims. It should also be noted that other state court defendants whose position in this case is very similar to Frumento's (Shepro, Duval, Molina, et al.) chose not to participate in the ownership trial.

The damage claims asserted by the Moccos against various professionals and individuals in the state case have not yet been tried and almost certainly will not and cannot be tried for at least two more years. Since it is already more than four years since this case was filed, and we must still expect at least two more years before a state court trial on the claims that actually relate to Frumento, it is clear that had they not removed the case to this Court the case against Frumento, including any claims that CT will assert against him since they are already asserting claims against the other lawyers with whom Frumento collaborated on the same transactions, could easily be consolidated with the anticipated Damages Trial in the state court.

C.   <u>There Are No Time-Barred Claims</u>

On pages 19-20 of the R&R, the Magistrate Judge reluctantly accepts

Mocco's argument that under New Jersey law, "the statute of limitations pertaining

to a defendant's claim for contribution or indemnification begins to accrue when

the plaintiff recovers a judgment against it." *Mettinger v. Globe Slicing Mach.*

*Co.*, 153 *N.J.* 371, 387 (1998).  There is therefore no possibility here that any such

claims by CT or Frumento are or could be time-barred.  The Report and

Recommendation then turns to the defendants' vague and undocumented

arguments that "potential affirmative contract and tort claims regarding the events

in question, which occurred in 2005 and 2006" are now time-barred.  (R&R at 20).

As a basis for its acceptance of this argument, the R&R cites to nothing more than

the reply briefs filed by Frumento and CT.  Examination of those reply briefs, to

which, of course, we had no opportunity to respond, shows that neither defendant

specified any particular tort or contract claim which they could or would assert

other than the contribution and indemnity claims.

More significantly, we know that, at this very moment in the state court case

CT IS ASSERTING TORT AND CONTRACT CLAIMS totaling more than $50

mil against six defendants.  (*See* Nance Cert. 2, <u>Exhibits E and F</u>).  CT has

additional claims that it has also asserted but which are barred by bankruptcy

filings.  In their argument about substantial prejudice they appear to have forgotten

26

these details.  (*See e.g.*, Nance Cert. 2, <u>Exhibit A</u> at 3 (equitable lien in favor of CT for $1.776 mil); <u>Exhibit M</u> (wire confirmation reflecting $1.776 mil payment to CT).

CT as a title insurer who has paid insurance claims and is subrogated to its "insureds" tort and contract claims has certain obvious rights which it has asserted in the state court case.  The same cannot be said for Mr. Frumento.  Frumento was not a party to the May 2006 transactions out of which the claims asserted here and in the state court by Mocco and CT arise.  Frumento was secretly (as shown only in email not on the recorded documents) advising and assisting his client (Cynthia Licata) in the violation of a court order (entered in a case in which Frumento appeared as counsel) as part of the perpetration of a type of fraud which is sometimes referred to as a "wild deed scam."

Frumento is not and was not a party to any of the contracts involved in this case although as an attorney and advisor he was, behind the scenes, involved in their drafting.  He, therefore, has no contract claims to assert here.  Likewise, he neither paid nor lost any money in the subject transactions.  He, therefore has no related tort claims.  The only claims he conceivably has are contribution and indemnity claims which are not time-barred.

D.    The False Claim of Lost Evidence

Starting at page 20 of the Report and Recommendation, the Magistrate

Judge makes reference to an assertion by CT that a "potential fact witness has

passed away". This is in fact the most egregious misrepresentation by CT and the

most outstanding misconception reflected in the R&R. First of all, although not

identified by name in the R&R, the reference is to an attorney by the name of

Kenneth Williams. In their original moving papers CT, apparently forgetting that

we had copies of the examination under oath that they had taken of Mr. Williams,

asserted that because of the "delay" they had been deprived of the opportunity to

examine Mr. Williams about his involvement in certain related transactions and

more particularly, his communications with counsel for the Moccos. We addressed

this issue in our brief in opposition to defendant CT's motion to dismiss, etc. dated

July 11, 2014. We request that the Court read what we wrote at that time. The

points to be made at this time are simply the following:

- Contrary to the misstatements of their initial moving brief before
  this Court, CT did examine Mr. Williams for 6-1/2 hours and
  included in that examination was a detailed questioning of Mr.
  Williams about his communications with Mocco's counsel and in
  particular about emails between him and Mocco's counsel which
  he produced and which CT has.

28

- Mr. Williams along with his partner, Todd Galante both from the New Jersey law firm then known as St. John and Wayne, represented an entity known as Enterprise Asset Management ("EAM"). EAM was not a party to the May 2006 transactions that are the subject of this litigation. EAM as explained in Mr. Williams' examination under oath unlike CT's insured's, walked away from a transaction with Mr. Frumento's client and her husband after they did their due diligence.

- Notwithstanding the Mocco opposition providing the Magistrate Judge with information which clearly showed that at most Mr. Williams was a witness of peripheral value whose testimony could easily be replaced by the testimony of his partner Mr. Galante and records which he had already given to CT, the Magistrate Judge in his R&R simply, and without analysis, concludes that a potential witness has passed away.

- Under New Jersey law the loss of a witness is only substantial prejudice if that witness's testimony cannot be replaced by the testimony of other witnesses, documents or other evidence. *See Mitchell, supra,* 331 *N.J. Super*. at 456 (finding a lack of substantial prejudice where there was a loss of once type of

29

evidence in light of other evidence regarding the same facts that was not lost)  Furthermore, since our complaint was filed within the six year statute of limitations the death of a witness cannot act as "substantial prejudice" requiring dismissal of the case. *See Hillsborough Tp. Bd. of Educ. v. Faridy Thorne Frayta, P.C.*, 321 *N.J. Super*. 275, 287-288 (App. Div. 1999) (finding that where the second action was filed before the expiration of the six-year statute of limitations, the possible loss of evidence during that time could not amount to substantial prejudice).

In sum, the Report and Recommendation's findings of substantial prejudice are unsupported by the facts and inconsistent with New Jersey law and logic.

## CONCLUSION

For these reasons and the reasons set forth in the briefs previously filed on this motion, we respectfully request that this Court reject the Magistrate Judge's Report and Recommendation, deny the defendants' motions and let this 4-1/4 year old case begin.

**SCARPONE & VARGO LLC**
*Attorneys for Plaintiffs Peter Mocco,*
*Lorraine Mocco, and FCHG IV*

By: _____ */s/ James A. Scarpone* _____
        JAMES A. SCARPONE

DATED:   April 28, 2016